COMMITTEE FOR CONSTITUTIONAL REFORM v SECRETARY OF
STATE

Docket No. 78117. Decided July 11, 1986. On application by the
plaintiffs for leave to appeal, the Supreme Court, in lieu of
granting leave, affirmed the judgment of the Court of Appeals.

The Committee for Constitutional Reform brought an original
action for mandamus in the Court of Appeals, seeking, inter
alia, to extend the constitutional requirement that the election
of justices of the Supreme Court be nonpartisan to the process
of nomination of candidates by compelling the Secretary of
State and certain members of the Board of Canvassers to refuse
to accept nominations of candidates for the office of justice of
the Supreme Court made at a convention of any political party,
and to accept nominating petitions from any qualified person
for the office of justice of the Supreme Court as prescribed
under the election law for candidates for the office of judge of
the Court of Appeals. The Court of Appeals, T. M. Burns, P.J.,
and R. B. Burns and Allen, JJ., denied the complaint for
mandamus by order (Docket No. 90557). The plaintiffs seek
leave to appeal.

In an opinion per curiam, signed by Chief Justice Williams
and Justices Levin, Brickley, Cavanagh, Boyle, and Riley,
the Supreme Court held:

The constitutional requirement of nonpartisanship with re-
spect to the office of justice of the Supreme Court applies only
to the election of justices; it does not preclude the nomination
of candidates for that office by party conventions.

1. The Michigan Constitution provides that justices of the
Supreme Court be elected at nonpartisan elections as provided
by law, and that nomination of justices be made in the manner
prescribed by law. In construing a constitutional provision, a
meaning that would naturally be conveyed to the popular mind
is to be applied. To clarify the meaning, the circumstances
surrounding the adoption of the provision and the purpose
sought to be accomplished by it may be considered. To ascer-
tain such circumstances and purposes, the addresses to the
people and the debates at the constitutional convention may be
consulted where there is a recurring thread of explanation,
binding together the constitutional concept.

2. An examination of the relevant debates of the Constitu-

tional Convention of 1961 leads to the conclusion that the framers intended the Legislature have the option to continue to provide for nomination of candidates for the office of justice of the Supreme Court at party conventions in line with the practice at the time of the convention.

3. It was also intended that the Legislature might provide for other methods of nomination, such as nonpartisan nomination, where it felt that such methods would offer better results.

4. An examination of the Address to the People regarding the 1963 Constitution reveals no requirement that the nomination process be nonpartisan. Thus, the provision is construed to mean what it states: The requirement of nonpartisanship applies to the election of justices; it does not preclude the nomination of candidates by party conventions.

5. Because none of the plaintiffs is actually running for the office of justice of the Supreme Court, their argument that they should be granted relief on the ground that Michigan's election laws are defective under the federal constitution with respect to independent candidate access to the ballot is premature.

Affirmed.

Justice ARCHER took no part in the decision of this case.

*Thomas E. Brennan* for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Gary P. Gordon* and *Richard P. Gartner,* Assistant Attorneys General, for the defendants.

PER CURIAM. The constitution of this state, Const 1963, art 6, § 2 provides:

The supreme court shall consist of seven justices *elected at non-partisan elections as provided by law.* The term of office shall be eight years and not more than two terms of office shall expire at the same time. *Nominations for justices of the supreme court shall be in the manner prescribed by law.* Any incumbent justice whose term is to expire may become a candidate for re-election by filing an affidavit of candidacy, in the form and manner prescribed by law, not less than 180 days

prior to the expiration of his term. [Emphasis added.]

Plaintiffs have requested the Court of Appeals and this Court to extend the requirement that elections for justices of this Court be nonpartisan to the process for nominating candidates for that office.[1] The Court of Appeals held that the "debates of the Constitutional Convention and the 'Address to the People' make it clear that Const 1963, art 6, § 2 does not *require* the legislature to provide for non-partisan nomination of candidates for the Supreme Court." We agree that the delegates voting for the constitutional provision had the intent that the Legislature might continue the then-existing system which combined partisan nomination of candidates with nonpartisan election. That intent was communicated to the electorate in the wording of the constitutional provision and the Address to the People. In adopting the constitution, the electorate adopted that intent. Consequently, we affirm the judgment of the Court of Appeals.

I

Plaintiffs filed an original action for mandamus[2]

---

[1] MCL 168.392; MSA 6.1392 provides:

At its fall state convention, each political party may nominate the number of candidates for the office of justice of the supreme court as are to be elected at the next ensuing general election.

MCL 168.393; MSA 6.1393 provides that such political party nominees shall be listed as candidates on the nonpartisan judicial ballot, but without party designation. Plaintiffs seek a declaration that these provisions violate Const 1963, art 6, § 2.

[2] Actions for mandamus against state officers may be filed as original actions in the Court of Appeals, MCL 600.440; MSA 27A.4401, MCL 600.310; MSA 27A.310; MCR 7.203(C)(2). Defendants argue that the form of action is inappropriate for a number of reasons. Among these, defendants argue that mandamus will lie only

in the Court of Appeals on February 13, 1986.[3] The complaint identifies plaintiff Committee for Constitutional Reform as an unincorporated ballot question committee with more than 1,000 contributing members organized for the purpose of amending the state constitution to require that justices of the Supreme Court be nominated at nonpartisan primary elections. All individual plaintiffs are identified residents and registered voters of the State of Michigan. Plaintiffs Bushnell, Keating, Fulkerson, Knoblock, and Britten are attorneys and otherwise qualified for the office of justice of the Supreme Court of this state. In addition, plaintiffs Britten and Knoblock are judges of the Fourth and Fifty-Second Judicial Circuits. Plaintiffs allege generally that they have been denied a right to vote for independent, nonpartisan candidates for the office of justice. Those plaintiffs qualified to serve in that office, allege that they have been denied "access to the ballot as independent, nonpartisan candidates for the office of justice of the Supreme Court of Michigan." There is no allegation that any plaintiff has made an actual request of any defendant for access to the ballot.

Defendants are Michigan's Secretary of State and the four members of the Michigan Board of Canvassers.

Plaintiffs allege that defendants have erred in accepting nominations of, and placing on the bal-

---

to enforce a clear legal duty and that plaintiffs' substantive argument fails to establish such a duty. Because we agree with defendants on the substantive issue, it is not necessary to resolve defendants' other arguments regarding the form of action.

[3] On the same day, plaintiffs filed with this Court an application for leave to appeal prior to decision by the Court of Appeals. That bypass application was rendered moot by the rapid resolution of the action at the Court of Appeals and plaintiffs' subsequent application for leave to appeal to this Court from the decision of the Court of Appeals. Accordingly, we deny the application for leave to appeal prior to decision of the Court of Appeals.

lot the names of candidates nominated by political parties as provided in MCL 168.392; MSA 6.1392 and MCL 168.393; MSA 6.1393.[4] Plaintiffs argue that Const 1963, art 6, § 2 requires that both nomination and election of justices must be nonpartisan. They argue that the Legislature has "neglected, failed and refused" to provide a statutory, nonpartisan method of nominating candidates. Plaintiffs have invited first the Court of Appeals and now this Court to declare MCL 168.392; MSA 6.1392 and MCL 168.393; MSA 6.1393 unconstitutional and to impose judicially a system for nominating candidates by petitions and a primary election detailed in plaintiffs' pleadings.

The Court of Appeals denied plaintiffs' complaint for mandamus in an order dated April 1, 1986. Plaintiffs have filed an application for leave to appeal to this Court.

II

For over a century, this Court has followed a number of consistent, "dovetailing rules of constitutional construction," *Carman v Secretary of State,* 384 Mich 443, 451; 185 NW2d 1 (1971); *Advisory Opinion on Constitutionality of 1978 PA 426,* 403 Mich 631, 639; 272 NW2d 495 (1978). "The cardinal rule of construction, concerning language, is to apply to it that meaning which it would naturally convey to the popular mind . . . ." *People v Dean,* 14 Mich 406, 417 (1866). A collateral rule "is that to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered." *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971), citing *Kearney v Bd of*

_____
[4] See n 1.

*State Auditors,* 189 Mich 666, 673; 155 NW 510 (1915).

"To ascertain the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished by the provision, the 'Address to the People' and the convention debates may be consulted." *Advisory Opinion on Constitutionality of 1978 PA 426, supra,* 403 Mich 640-641, citing *Regents of the Univ of Michigan v Michigan,* 395 Mich 52; 235 NW2d 1 (1975). "Courts on numerous occasions have gone to the constitutional convention debates and addresses to the people to decide the meaning of the Constitution." *Burdick v Secretary of State,* 373 Mich 578, 584; 130 NW2d 380 (1964).

In *Regents, supra,* this Court explained the appropriate use of the record of debates contained in the Official Record of the Constitutional Convention of 1961 and the "Address to the People":

> The debates must be placed in perspective. They are individual expressions of concepts as the speakers perceive them (or make an effort to explain them). Although they are sometimes illuminating, affording a sense of direction, they are not decisive as to the intent of the general convention (or of the people) in adopting the measures.
>
> Therefore, we will turn to the committee debates only in the absence of guidance in the constitutional language as well as in the "Address to the People," or *when we find in the debates a recurring thread of explanation binding together the whole of a constitutional concept.* The reliability of the "Address to the People" (now appearing textually as "Convention Comments") lies in the fact that it was approved by the general convention on August 1, 1962 as an explanation of the proposed constitution. The "Address" also was widely disseminated prior to adoption of the constitution by vote of the people. [Emphasis added. 395 Mich 59-60.]

In *Pfeiffer v Detroit Bd of Ed,* 118 Mich 560, 564; 77 NW 250 (1898), this Court stated:

> In determining this question, we should endeavor to place ourselves in the position of the framers of the Constitution, and ascertain what was meant at the time; for, if we are successful in doing this, we have solved the question of its meaning for all time. It could not mean one thing at the time of its adoption, and another thing today, when public sentiments have undergone a change. *McPherson v Secretary of State,* 92 Mich 377 (16 LRA 475, 31 Am St Rep 587) [52 NW 469 (1892)].

The intent of the framers, however, must be used as part of the primary rule of "common understanding" described by Justice COOLEY:

> "A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed.' (Cooley's Const Lim [6th ed] 81)." (Emphasis added.) [384 Mich 405.]

## III

Since it attained statehood almost 150 years ago, Michigan has had a variety of methods of selection of justices. They have been appointed by the Governor with the advice and consent of the Senate,

Const 1835, art 6, § 2. The Court has consisted of the assembled judges of circuit courts, Const 1850, art 6, § 2. It has consisted of one chief justice and three associate justices elected according to legislation, Const 1850, art 6, § 2. As originally adopted, Const 1908, art 7, § 2 provided for "one chief justice and associate justices, to be chosen by the electors of the state at the regular biennial spring elections . . . ."[5]

At the biennial spring election of 1939, the electors adopted a proposal which became art 7, § 23 of the Constitution of 1908.[6] The proposal required that all elections of justices, judges, and

[5] During this period of time, Michigan had two types of general elections, one in November of even numbered years and a biennial spring election in odd numbered years, 1929 CL 2749, 2750, 2751; 1948 CL 145.3, 145.4, 145.5; MSA 6.3, 6.4, 6.5. Except for the offices to be filled, the procedures were largely the same for both types of general elections. Justices were elected at the spring biennial election, 1929 CL 13528; 1948 CL 601.2; MSA 27.2—following insofar as possible the procedures for circuit judges, 1929 CL 13529; 1948 CL 601.3; MSA 27.23. Prior to the 1939 constitutional amendment referred to in the text, circuit judges were nominated at partisan primary elections, 1929 CL 2858. However, candidates for statewide offices were nominated at state political party conventions. These candidates were placed on the ballot under the vignette of the nominating party, 1929 CL 3060, 3062.

The 1939 constitutional amendment discussed later in the text was self-executing. The statutory procedures were left unchanged until 1954 PA 116, discussed below, n 10, see 1948 CL 156.2, 177.3, 177.5; MSA 6.113, 6.346, 6.348. From 1939 until passage of 1954 PA 116, many of the statutory provisions relating to judicial offices were null to the extent they were in conflict with the 1939 amendment which added Const 1908, art 7, § 23. See n 6.

[6]                    PROPOSAL NO. 1.

Amendment to the constitution relative to the "non-partisan election of judges, etc.," proposed by initiative petition, and ratified by the people at the April election of nineteen hundred thirty-nine.

                    ARTICLE VII.

Sec. 23. All primary elections and elections of justices of the supreme court, judges of the circuit court, judges of probate courts and all county judicial officers provided for by the legislature under section 21 of article VII of the constitution shall be non-partisan and shall be conducted hereunder. For the purposes of this section, all elections at which candidates

judicial officers be nonpartisan. It applied to both primary elections and general elections. The provision required that all judicial officers except justices "shall be [nominated] at non-partisan primary elections." However, "[n]ominations for justices of the supreme court shall be made as now or hereafter provided by law . . . ." This language allowed the Legislature to continue the practice of nominating candidates for the office of justice at state political conventions.[7] Of particular note is that this amendment was proposed by initiative petition, expressing the will of the electorate in as direct a fashion as possible.

---

for said judicial offices are nominated are designated "primary elections". Nominations for justices of the supreme court shall be made as now or hereafter provided by law; nominations for all other said judicial offices shall be made at non-partisan primary elections. This section is declared to be self-executing. Except as in the constitution otherwise provided, all primary election and election laws, including laws pertaining to partisan primaries and elections, shall, so far as applicable, govern primary elections and elections hereunder.

Nomination petitions for candidates at any primary election hereunder, in form as designated by the secretary of state, shall be filed at least thirty-five days before such primary election. Nomination petitions for judge of the circuit court shall be filed with the secretary of state, and for all other judicial offices affected hereby with the county clerk. Petitions shall contain the signatures, addresses and dates of signing of a number of qualified voters equal to not less than two per cent, nor more than four per cent, of the total number of votes cast for secretary of state at the last preceding November election in the judicial district or county, as applicable.

One separate judicial ballot containing no party designation shall be used for primary elections and elections hereunder. Such ballots shall contain the names of the candidates certified, or the nominees nominated, as provided herein. There shall be printed upon the ballot under the name of each incumbent judicial officer, who is a candidate for nomination or election to the same office, the designation of that office. At any such primary election no voter shall vote for more candidates for any office than the number to be elected thereto. The candidates receiving the largest number of votes at any such primary election, to a number equal to twice the number of places to be filled, shall be nominated.

[7] See n 5.

Const 1908, art 7, § 23 was subject to amendments proposed by joint legislative resolution adopted in the spring elections of 1947[8] and

---

[8]                        PROPOSAL NO. 1.

Amendment to the constitution relative to "the non-partisan primary election of judicial officers in cases of no contest", proposed by joint resolution of the 1947 regular session, and ratified by the people at the biennial spring election, April 7, 1947.

ARTICLE VII.

Sec. 23. All primary elections and elections of justices of the supreme court, judges of the circuit court, judges of probate courts and all county judicial officers provided for by the legislature under section 21 of article VII of the constitution shall be non-partisan and shall be conducted hereunder. For the purposes of this section, all elections at which candidates for said judicial offices are nominated are designated "primary elections". Nominations for justices of the supreme court shall be made as now or hereafter provided by law; nominations for all other said judicial offices shall be made at non-partisan primary elections. This section is declared to be self-executing. Except as in the constitution otherwise provided, all primary election and election laws, including laws pertaining to partisan primaries and elections, shall, so far as applicable, govern primary elections and elections hereunder.

Nomination petitions for candidates at any primary election hereunder, in form as designated by the secretary of state, shall be filed at least 35 days before such primary election. Nomination petitions for judge of the circuit court shall be filed with the secretary of state, and for all other judicial offices affected hereby with the county clerk. Petitions shall contain the signatures, addresses and dates of signing of a number of qualified voters equal to not less than 2 per cent, nor more than 4 per cent, of the total number of votes cast for secretary of state at the last preceding November election in the judicial district or county, as applicable.

One separate judicial ballot containing no party designation shall be used for primary elections and elections hereunder. Such ballots shall contain the names of the candidates certified, or the nominees nominated, as provided herein. There shall be printed upon the ballot under the name of each incumbent judicial officer, who is a candidate for nomination or election to the same office, the designation of that office. At any such primary election no voter shall vote for more candidates for any office than the number to be elected thereto. The candidates receiving the largest number of votes at any such primary election, to a number equal to twice the number of places to be filled, shall be nominated.

If upon the expiration of the time for filing petitions for the

1955.[9] Each amendment continued the key require-
ment that candidates for justice of the Supreme
Court shall be nominated "as now or hereinafter
provided by law" while "nominations for all other
said judicial offices shall be made at non-partisan
primary elections."[10]

---

primary election of said judicial officers, it shall appear that as
to any such judicial office on any non-partisan ticket there is no
opposition, then the officer with whom such petitions are filed
shall certify to the proper board of election commissioners the
name of such candidate for said judicial office whose petitions
have been properly filed, and such candidate shall be the
nominee for such judicial office and shall be so certified. As to
such judicial office there shall be no primary election and such
judicial office shall be omitted from the judicial primary elec-
tion ballot. The provisions of this paragraph shall likewise
apply where more than 1 candidate is to be nominated for any
judicial office and there are no more candidates than there are
persons to be nominated.

[9] AMENDMENT to the constitution relative to non-partisan
judicial elections proposed by joint resolution at the 1955
regular session and ratified by the people at the biennial spring
election, April 4, 1955.

ARTICLE VII.

Sec. 23. All primary elections and elections of justices of the
supreme court, judges of the circuit court, judges of probate
courts and all county judicial officers provided for by the
legislature under section 21 of article 7 of the constitution shall
be non-partisan and shall be conducted as prescribed by law.
All elections at which candidates for said judicial offices are
nominated are designated "primary elections." Nominations for
justices of the supreme court shall be made as now or hereafter
provided by law; nominations for all other said judicial offices
shall be made at non-partisan primary elections. Except as in
the constitution otherwise provided, all primary election and
election laws, including laws pertaining to partisan primaries
and elections, shall, so far as applicable, govern nominating
procedures, primary elections and elections hereunder. There
shall be printed upon the ballot under the name of each
incumbent judicial officer, who is a candidate for nomination or
election to the same office, the designation of that office.

[10] The Michigan election law was revised and recodified in 1954 PA
116. This statute expressly provided for nominations of candidates for
the office of supreme court justice at political party conventions, 1948
CL 168.392; MSA 6.1392. For current wording see n 1. Candidates
were nominated for other judicial offices by a combination of nominat-
ing petitions and nonpartisan primary elections, 1948 CL 168.412,
168.413; MSA 6.1412, 6.1413 (judges of circuit court); 1948 CL 168.432,

Thus, as delegates assembled for the 1961 state Constitutional Convention, the electors of the state had three times in just two decades indicated that nominations of candidates for justices of the Supreme Court could—but were not required to—be at state party conventions while all other judicial officers were required to be nominated by petition and nonpartisan primary elections. Candidates for the office of justice were, in fact, nominated at state political conventions.

IV

Delegates to the 1961 Constitutional Convention were initially organized into fourteen committees. Ten of these committees drafted substantive committee proposals. These proposals were then referred to the committee of the whole for consideration. When the drafting committee was not unanimous concerning a proposal, it would offer a majority report which formed the initial basis for consideration by the committee of the whole. Committee members had the option of offering a minority proposal and report which normally was the first substitute considered. Any delegate, as a member of the committee of the whole, had the prerogative to offer a substitute for an entire proposal or an amendment to a portion of a proposal, all considered under the rules of the committee of the whole. Once the committee of the whole had debated all substitutes and amendments to a proposal and a majority of the committee agreed on a version of the proposal, the proposal would progress to formal readings and considerations by the convention.[11]

168.433; MSA 6.1432, 6.1433 (judges of probate); 1948 CL 168.452, 168.453; MSA 6.1452, 6.1453 (circuit court commissioner).

[11] Both the committee of the whole and the convention were consti-

Committee proposal 91 dealt with nomination and election of justices of the Supreme Court. It was drafted by the Committee on the Judicial Branch. The specific provision on nomination was § g[12] of committee proposal 91. Section g was the fourth of four alternatives considered by the Committee on the Judicial Branch. The committee chairman's report summarized the alternatives:

> 1. Some appointive method providing either for appointment of justices of the supreme court by the governor:
> (a) With the advice and consent of the senate; or
> (b) From a list of qualified appointees submitted in accordance with the so called "Missouri plan", or "ABA plan".
> 2. The continuance of the present provisions of section 23, as implemented by statute, which results in partisan nomination of justices of the supreme court followed by "nonpartisan" statewide election.
> 3. A constitutional change or direction to the legislature to provide for a statewide nonpartisan primary followed by a statewide nonpartisan election or, in the alternative, a statewide partisan primary followed by a statewide partisan election.
> 4. A plan for election of justices of the supreme court from areas within the state so arranged as to be as nearly as possible equal in population and availability of qualified candidates. [1 Official Record, Constitutional Convention 1961, p 1257.]

tuted of all the delegates. In general, the rules of the committee of the whole promoted more freewheeling debate appropriate to gathering a consensus of all delegates on each proposal.

[12] As the debate proceeded, it became clear that § g did not command a true majority of the Committee on the Judicial Branch. Rather, committee chairman Robert Danhof—now chief judge of the Court of Appeals—secured a majority vote because it was time for the committee of the whole to act on the proposals of the Committee on the Judicial Branch, 1 Official Record, Constitutional Convention 1961, p 1322, comments of Delegate Sidney Barthwell; p 1324, comments of Delegate Harold E. Bledsoe; p 1325, comments of Delegate Joseph D. Lawrence, Jr.; 2 Official Record, p 2725, comments of Delegate Danhof.

Section g, a districting plan, provided for non-partisan election of nine justices, three elected from Wayne County and one elected from each of six other geographic districts. Candidates for the office would be selected at a nonpartisan primary election.

The committee minority report favored striking § g, leaving only the requirement of nonpartisan elections:

> It is the belief of the proponents of this minority report that the present system wherein the election of supreme court justices is on a statewide nonpartisan basis, has worked very well in our state.
>
> The legislature has provided a system of nomination and election under the 1908 constitution which has worked very well in the state of Michigan. By removing the language contained in section g, the legislature would have the power to revise the present procedure to meet changing needs of the state and devise the best possible system: Provided however, That election of supreme court judges would be on a statewide, nonpartisan basis.
>
> The state bar committee on court administration, consisting of 42 members headed by Judge Noel P. Fox, recommended in 1961 in its report to the state bar that "the present system of nominating and electing supreme court justices be retained, the same provisions to apply to judges of an intermediate court of appeals, if the latter court be established by the constitution".
>
> The district plan for election of supreme court justices would result in disenfranchising a majority of the electors in the state from voting for all of the judges exercising statewide power and jurisdiction. It is difficult to conceive of any principle which would limit a supreme court justice's opinions and point of view to a particular district of the state rather than to the state as a whole. The

district plan would strongly tend to inject section-
alism into the opinions and decisions of the court.

In conclusion, the proponents of this minority
report believe, after listening to testimony by rep-
resentatives of the bench and bar throughout the
state and at all levels, as well as representatives
from the bar associations of other states, that our
present system for selection of supreme court jus-
tices is far superior to any alternative plan pre-
sented before our committee. [*Id.,* p 1259.]

Discussion of the majority, minority, and alter-
nate proposals encompasses over 230 pages of the
convention record. The initial debate is recorded at
pages 1289-1355, 1564-1604. Delegate Kenneth
Prettie presented the first argument on behalf of
the districting proposal. His argument on the need
for change is much like that offered by plaintiffs in
this case. He argued:

Several members of our committee, as well as
lawyers statewide have long been concerned with
the flagrant inconsistency of our supreme court
justices being nominated at party conventions and
then, so to speak, taking a bath and running as
nonpartisan candidates for this high office. It was
obvious that some correction of this anomaly was
necessary if the integrity of this court was to be
preserved and public respect for it maintained.
Such an inconsistency, I believe—and I think
many join me in this—reflects at the very outset
upon the integrity and the honesty and the politi-
cal acumen of every candidate for this high office.
[*Id.,* p 1314.]

The next speaker, also in favor of districting,
was Delegate Karl Leibrand. He presented an
historical argument which gives context to the
prior constitutional provision discussed in Part III,
above. He argued that it took only the fifteen
years from 1835 to 1850 for "the people of the

state of Michigan to have a belly full of [the gubernatorial appointment] system." After eighty-nine years (1850-1939) of partisanship, the people "[b]y initiative petition, not through the political parties, not through the legislature, but their own initiative petitions, . . . placed on the ballot in 1939 a measure which was designed to make the election of judges truly nonpartisan." *Id.,* p 1317. Delegate Leibrand observed that the convention would be "treading on awful [sic] thin ice" if they were "to tinker with any proposition which has been put into the constitution by the people." He explained the rationale for the apparent anomaly of partisan nominations of candidates for justice of the supreme court in an otherwise nonpartisan system:

> Going back to this 1939 nonpartisan amendment, initiative amendment, that provided for the complete 100 per cent nonpartisan nomination and election of probate judges and circuit judges in their counties and districts, nomination by nonpartisan petition, election on nonpartisan ballots, when the favorers of the initiative amendment got to the supreme court, and how to handle that, they ran into trouble. They knew, as well as we know today, that it was a very, very difficult proposition for a lone nonpartisan candidate to campaign the entire state of Michigan, and to carry the campaign costs, the expenses that were incident to that. So the framers of that initiative amendment did what we are doing here in this convention with many matters for which they could find no solution. They passed the buck to the legislature, and they said the nonpartisan nomination—the nomination, not nonpartisan, but the nomination for justices of the supreme court shall be made in such manner as is provided by the legislature. And the legislature had as much trouble with that proposition as had the framers of the initiative amendment. And so the legislature came

up with this proposition of nomination at party conventions and election statewide on nonpartisan ballots . . . . [*Id.,* p 1318.]

The first speaker for the minority position was Delegate William D. Ford. He argued the potential danger of building a novel system into the constitution:

Now, regardless of what your feelings may be about the present system, let's get clear at the outset that this is not a constitutional system we're talking about, basically. We are talking about a statutory system, and all of the things that I have heard criticized about the present system can be changed and could have been changed at any time that our bar association, which is one of the loudest critics, would have had the ambition to go over on capitol hill and talk to the people in the legislature; because all the present constitution requires with respect to the supreme court is simply that the justices be elected on a nonpartisan basis, and that they be nominated in a manner provided by law. The constitution doesn't say that the parties will nominate them at their party conventions. It doesn't say they can't be nominated on a partisan basis, that they can't be nominated by a primary, and, as a matter of fact, Mr. Prettie's entire plan could be implemented by statute without changing the 1908 constitution. There is nothing in Mr. Prettie's plan, as we look at it, that would be inconsistent under the present provisions of the constitution. So what the proposal of the majority is asking you to do is by constitution freeze in for all time a plan that may or may not be better than what we have.

Assuming for the moment the possibility that we ought to try something like this, it would seem that the wisest way to try it would be to try it by statutory change, and if it doesn't work, and if this produces some of the evils that many of us are prone to suspect it of, then the transition back to a

system that has been in existence for many years would be rather a quick transition, and could be accomplished before great mischief was done. [*Id.,* pp 1319-1320.]

Mr. Ford argued that a districting plan would introduce regionalism into the deliberations of the Supreme Court because each justice would be responsible to electors in only a small area of the state. In contrast, the existing system had resulted in justices serving from all geographic regions of the state, but responsible to a statewide electorate.

After much debate, the committee of the whole considered whether to adopt the minority alternative, striking the districting plan. It voted to accept the minority proposal, 69 to 58. By itself, this vote is inconclusive, see *Regents, supra.* It was a clear rejection of building districting into the constitution. It might also indicate a preference for the status quo, but we are reluctant to make such a conclusion from such a preliminary vote.

The next alternative considered was the "Missouri" or "ABA" plan in which a blue-ribbon committee proposed a limited number of qualified candidates from which the Governor would appoint justices to the Supreme Court. Once appointed, a justice would be placed on the ballot after three years, and every ten years thereafter, for "approval or rejection by the electorate." 1 Official Record, p 1334. Delegate Lawrence and other proponents argued:

The American bar association's plan affords the means of avoiding the weaknesses in other existing methods, while retaining their desirable features. It provides for the filling of judicial vacancies by appointment by the governor from nominations submitted by a nonpartisan commission composed of lawyers, judges and laymen. Tenure of

judges so appointed is subject only to vote of the people at a noncompetitive election. This relieves the judge from the necessity of campaigning for office against opposing candidates, but still requires him to answer to the electorate. These 2 distinctive features tend to assure selection and retention of the best qualified judges. [*Id.*, p 1335.]

Opposition to the ABA plan centered on its being a retreat from elective democracy. Delegate Arthur T. Iverson argued that there was nothing "so sacrosanct about our courts that the voters of this state should be deprived of their franchise in selecting the judiciary." *Id.*, p 1337. The committee of the whole rejected the plan 25 to 91. *Id.*, p 1341. A plan for gubernatorial appointment with the consent of the Senate was rejected 30 to 95. *Id.*, p 1352. A third gubernatorial appointment plan was rejected 32 to 89. *Id.*, p 1355. At that point, the committee of the whole passed further consideration of committee proposal 91 to debate other portions of the judicial article.

When the committee of the whole returned to the question of the process for selecting justices, the first proposed amendment read, in part:

Justices shall be nominated and elected at non-partisan elections, conducted as provided by law. The legislature may provide for nomination and election by districts. Incumbent justices may secure their nomination by filing an affidavit of intention to run as shall be provided by law. [*Id.*, p 1564.]

The proponent of the amendment, Delegate Richard D. Kuhn, argued that it presented a "very flexible" way of achieving a "nonpartisan supreme court." Delegate Leibrand argued, in opposition:

I am worried about . . . the cost of this state-

wide nonpartisan nomination and election. Estimates before our committee were that such a statewide run costs from $30,000 to $50,000. Here we have 2 statewide runs, one in the primary and one in the general election. Now, that is absolutely beyond the financial ability of the ordinary lawyer or judge. The only way that he can campaign twice on a statewide basis is to get the support of some pressure group, and that isn't the kind of judge or justice of the supreme court that we want. This situation of nonpartisan election is not comparable. Statewide nonpartisan election is not comparable with the cost of being elected governor because governors run on a party basis and have the financial backing and the manpower of the party behind him. Here are judges all alone and forlorn trying to put on 2 statewide campaigns in 1 year at a cost of $60,000 to $100,000. I feel that it is impractical. There are good things in Mr. Kuhn's proposed amendment but I feel for the reasons stated, I could not support it. [*Id.,* p 1565.]

The proposal was rejected by voice vote. A request for a division of the House on the amendment failed for lack of support. *Id.,* p 1566.

Further amendments were offered and rejected. Delegate William F. Hanna offered a proposal calling for nine justices elected for ten years combining three methods for nomination: by a political party convention, by petitions signed by a number of electors equal to three percent of the last gubernatorial vote, and by incumbent justices nominating themselves. *Id.,* p 1569. The amendment was initially rejected by voice vote. *Id.,* p 1569. The committee of the whole voted to reconsider. It then divided the amendment into sections. It approved ten-year terms, 56 to 52. *Id.,* p 1572. It approved having nine justices, 84 to 27. *Id.,* p 1573. However, without any debate, it rejected the proposal for nominating justices, 52 to 59. *Id.,* p 1573.

At this point Delegate Tom Downs offered an

amendment from the floor providing for only political party nomination. It was rejected by voice vote without debate. *Id.,* p 1574.

Delegate Ford offered the following amendment: "Nominations for justices of the supreme court shall be made as now or hereafter provided by law." *Id.,* p 1574. Delegate Raymond L. King sought to add a provision for self-nomination of incumbents. Delegate Lawrence moved to defer consideration of both the Ford amendment and the King amendment to the amendment. The amendment was rejected but the committee of the whole immediately voted to "rise," a step preliminary to recess by the convention. After reconvening and resolving into the committee of the whole, Delegate King withdrew his amendment on self-nomination by incumbents. Again without debate, the Ford amendment was defeated 38 to 78.

Plaintiffs argue that the defeat of the Ford amendment constituted a vote "to reject the then-existing partisan convention nomination system." That is certainly a reasonable inference, just as it is reasonable to infer that the committee of the whole rejected nonpartisan nominating elections when it rejected an amendment to that effect by voice vote shortly before considering the Ford amendment. However, these were by no means the final votes on either proposition. With the exception of the votes approving nine justices and ten-year terms of office, neither of which became part of the final constitution, all votes rejected whatever proposal was under consideration.

Immediately after rejection of the Ford amendment, an amendment requiring partisan elections was offered and withdrawn. *Id.,* p 1577. Next, the districting plan was offered in a modified form. *Id.,* p 1577. After much debate, the districting plan was again rejected, 62 to 64. *Id.,* p 1589. The

amendment requiring partisan elections was again offered, argued, and defeated by voice vote. *Id.,* pp 1589-1590.

Up to this point, the committee of the whole had not approved any process for nominating candidates for justice of the supreme court. After consideration and rejection of the six proposals discussed above, it came time for the committee of the whole to consider a proposal by Delegate Danhof, chairman of the Committee on the Judicial Branch. The amendment proposed nine justices, elected at nonpartisan elections for eight-year terms with three types of nomination: by political party convention, by self-nomination by an incumbent, and by nominating petition signed by a number of electors equal to three percent of the last gubernatorial vote. *Id.,* p 1590.[13] The committee of the whole rejected three attempts to amend the Danhof amendment. It then adopted the Danhof amendment 82 to 46. *Id.,* p 1599. The committee of the whole recommended the Danhof amendment of committee proposal 91 to the convention. *Id.,* p 1617. The convention accepted the amendment at first reading, 72 to 61. *Id.,* pp 1618-1619.

The second reading of committee proposal 91 produced seven attempts to amend, three of which were approved. The first amendment offered was another districting plan. Among the speakers against the districting amendment was Delegate

---

[13] Support for this amendment was widespread, but hardly enthusiastic. Delegate Charles J. Davis said there was no "perfect plan." Party nomination "is admittedly somewhat weak." But "some of the alternatives to this plan are less palatable than this." *Id.,* p 1591. Delegate Ford agreed that the committee of the whole "had reached a stage where a compromise that may not make all of us happy, but which accomplishes substantially in the minds of many of us the best plan that we could come up with . . . , is better than no concrete plan at all." *Id.,* p 1591. Delegate John B. Martin observed, "[W]e have gone all the way around the mulberry bush, and we are back to practically the wisdom or lack of wisdom of the 1908 convention [sic] . . . ." He urged that the committee of the whole had spent as much time on the question as "we profitably can." *Id.,* pp 1591-1592.

Glenn S. Allen, Jr.[14] Delegate Allen offered three points: There were considerable problems with the districting plan in effect in Illinois; even on a district basis, running for office was so expensive that all but "independently wealthy" candidates must "depend on other people's money"; and, more to our point, Michigan had a districting plan from 1850 to 1856 which contemporary services indicated, "did not turn out to be too satisfactory." Delegate Allen stated:

> I admit that the present system has not been entirely satisfactory but I say that the system that is proposed by this amendment also is unsatisfactory, and if we are going to make a change, let's make it a change that is for the better and let's not go back to something that hasn't been satisfactory either in Illinois or in the limited experience that Michigan had. [2 Official Record, p 2726.]

The districting plan was again defeated 56 to 74. *Id.,* pp 2729-2730.

Next, delegate Danhof offered two amendments. Each amendment was directed at a separate sentence of his prior proposal. The first was worded, "The supreme court shall consist of 9 justices to be elected at nonpartisan elections as provided by law." His intent was to add permission for the Legislature to provide for primaries to the nominating procedures already approved by the convention. "Further, it gives the legislature the discretion that it now has when it talks in the present constitution about nonpartisan elections. I think that this leaves it as we now have it." *Id.,* p 2730. This amendment passed, 72 to 53. *Id.,* p 2731. The second Danhof amendment was that the language on nomination read:

---

[14] Judge ALLEN was a member of the Court of Appeals panel which decided this case. No party claims error. We are aware of no basis for such a claim.

> Nominations for justices of the supreme court shall be in the manner as provided by law, except any incumbent justice whose term is to expire may become a candidate for reelection by filing an affidavit of candidacy. [*Id.,* p 2731.]

The only debate on this proposal was:

> MR. DANHOF: Mr. President, members of the convention, it was brought to my attention that the language that we used, "Each political party at party convention" was in essence what the statute is at the present time. I feel that to freeze this particular matter for all time in here would not be advantageous. I think that we will retain what is good by allowing an incumbent justice to file an affidavit for reelection and allow the legislature to fix the manner, as they now do, for the nomination of offices of supreme court justices. We do provide that any incumbent justice may file an affidavit for reelection and further, "Any person otherwise qualified" can become a candidate in the manner stated in the last sentence. I think this makes a better document. I think it allows us to return to our basic premise. At this time I would urge the adoption of the amendment.
>
> PRESIDENT NISBET: Mr. Ford.
>
> MR. FORD: I rise to support Mr. Danhof's amendment at this point, recognizing that we are now evolving closer to the language that resulted from the several amendments to the 1908 constitution and giving us the language that we are now functioning under. The legislature at the present time would have the power to change the manner of nomination in party conventions. It hasn't seen fit to do so and there has been no great demand at that level for it. For that reason and for the reason that there should always be room for improvement, I think that this is an improvement in the language we've adopted. [*Id.,* p 2731.]

The amendment was adopted by voice vote. *Id.,* p

2731.[15] Except for minor changes in style, this amendment was adopted in Const 1963, art 6, § 2.

This summary of the relevant debates of the Constitutional Convention has been lengthy, fulfilling the mandate of *Regents, supra,* 395 Mich 59-60, that we find "a recurring thread of explanation binding together the whole of a constitutional concept." We conclude that the debates amply demonstrate the intent of the convention that the Legislature have the option to continue providing for nominations of candidates for supreme court justice at political party conventions. It was also the intent that the Legislature might provide for other methods of nomination, such as nonpartisan nomination, if it felt such methods might offer better results.[16]

The Address to the People includes the following comments on Const 1963, art 6, § 2:

This is a revision of Sec. 2, Article VII, of the present constitution. It incorporates these changes:

\* \* \*

3. Removes incumbent justices farther from political considerations by permitting them to become candidates for re-election by filing an affidavit of candidacy not less than 180 days prior to the expiration of their terms.

Latitude is given to the legislature in the

---

[15] In other actions, the convention rejected an effort to have nominations by petitions signed by electors amounting to one percent of the last gubernatorial vote, struck all nomination by petition in favor of legislative action, rejected an attempt to strike incumbent self-nomination, and rejected a plan combining partisan nomination, nonpartisan election, and incumbent running unopposed for approval or disapproval. *Id.,* pp 2732-2735.

[16] As this opinion is being prepared, the Legislature is considering HB 5089 which provides for nomination of candidates for justice, and other offices, by nominating petition. The pending legislation does not affect nomination by political party convention.

method to be prescribed for nominating candidates
for the supreme court, but elections continue to be
non-partisan. [2 Official Record, pp 3384-3385.]

The format of the Address is to list differences
between the 1908 and proposed 1963 Constitutions.
The Address does not indicate that the Legisla-
ture's power to provide for partisan nomination
has been removed. Rather, it points out that the
continued requirement of nonpartisanship applies
to elections, not the method for nomination. The
only indicated change in the method of nomina-
tion is incumbent self-nomination, which is de-
scribed as a removal from political considerations.
There would be no removal from partisan consid-
eration in self-nomination unless partisan consid-
erations were possible in the other method of
nomination. The address communicates with rea-
sonable clarity that there is no requirement that
the nomination process be nonpartisan.

We conclude that Const 1963, art 6, § 2 was
intended to mean exactly as it states. The require-
ment of nonpartisanship applies to the election. It
does not preclude nomination of candidates by
party conventions.

V

Plaintiffs submit two additional arguments.
They argue that federal courts have held Michigan
election laws defective under the First and Four-
teenth Amendments of the federal constitution
because those laws do not provide a means by
which an independent candidate may gain access
to the ballot. *Goldman-Frankie v Austin,* 727 F2d
603 (CA 6, 1984); *McCarthy v Austin,* 423 F Supp
990 (WD Mich, 1976); *Hall v Austin,* 495 F Supp
782 (ED Mich, 1980), each relying on *Storer v*

*Brown,* 415 US 724; 94 S Ct 1274; 39 L Ed 2d 714 (1974). Plaintiffs state, "The failure of the Michigan legislature to respond to judicial prodding in the area of election law reform is acutely noted" in *Goldman-Frankie, supra.*[17] Without citation of authority on this point plaintiffs argue that this Court "has the inherent power to establish, at least for the time being, a system of non-partisan nomination."[18]

---

[17] Despite existing legal precedent, particularly *McCarthy v Austin,* 423 F Supp 990 (WD Mich, 1976), wherein the Michigan scheme was expressly declared unconstitutional for its failure to provide independent candidates for public office with a means of access to the ballot, the Michigan legislature continued to ignore the evolving judicial pronouncements as late as the 1980 presidential election. In that election Gus Hall and Angela Davis, running as independent candidates in Michigan for president and vice-president, respectively, were forced to resort to the federal court to obtain ballot position. *Hall v Austin,* 495 F Supp 782 (ED Mich, 1980).

Michigan has, to date, failed to remedy the situation. This Court is therefore compelled to again declare, in absolute terms, that the Michigan election laws, so far as they foreclose independent candidates access to the ballot, are unconstitutional. [*Goldman-Frankie v Austin,* 727 F2d 603, 607 (CA 6, 1984).]

[18] Plaintiffs' prayer for relief from this Court includes the following requests:

3) A declaration that MCLA 168.392; MSA 6.1392 and MCLA 168.393; MSA 6.1393 are unconstitutional.

4) A further order of this Honorable Court directing Defendants, unless the legislature shall timely enact a statutory means for the non-partisan nomination of candidates for the office of Supreme Court justice, to accept for filing nominating petitions in the form prescribed by MCLA 168.544a; MSA 6.1544(1) from any qualified person, in such number as would have qualified that person to be a candidate for the office of judge of the Court of Appeals in all three election districts of the Court of Appeals; provided that such petitions shall specify the incumbent justice of the Supreme Court sought to be succeeded; and shall be filed not less than 180 days prior to the expiration of the term of such incumbent justice.

5) A further order of this Honorable Court directing that if more than one candidate files petitions to succeed an incumbent justice of the Supreme Court, which incumbent justice shall have filed an affidavit of candidacy pursuant to Const 1963, Article VI, section 2, the names of all such candidates,

Defendants argue that this portion of plaintiffs' complaint is not appropriate for declaratory judgment. Defendants argue that courts do not issue decrees on hypothetical questions. MCR 2.605(A) authorizes declaratory judgments on "a case of actual controversy." Since no plaintiff is actually running for the office of Supreme Court justice, this argument is premature, *Shavers v Attorney General,* 402 Mich 554, 589; 267 NW2d 72 (1978), cert den 442 US 934 (1979). We agree.

Pursuant to MCR 7.302(F)(1), we affirm the judgment of the Court of Appeals.

WILLIAMS, C.J., and LEVIN, BRICKLEY, CAVANAGH, BOYLE, and RILEY, JJ., concurred.

ARCHER, J., took no part in the decision of this case.

---

except the incumbent, shall be printed upon the non-partisan section of the primary ballot, and the candidate receiving the most votes in such primary election shall be declared nominated, and such candidate's name shall be printed on the general election ballot together with the name of the incumbent justice as provided by law.

6) A further order of this Honorable Court directing that if more than two candidates file petitions to succeed an incumbent justice of the Supreme Court which incumbent shall not have filed an affidavit of candidacy pursuant to Const 1963, Article VI, section 2, the names of all such candidates shall be printed upon the non-partisan section of the primary ballot, and the two candidates receiving the most votes in such primary election shall be declared nominated, and such candidates [sic] names shall be printed on the general election ballot as provided by law.

7) A further order directing that the Defendants be governed by the provisions of MCLA 168.409b(5); MSA 6.1409(2) [sic] with respect to the listing of candidates for the office of justice of the Supreme Court at the general election on November 4, 1986.