PEOPLE v DeJONGE (AFTER REMAND)

Docket No. 91479. Argued November 10, 1992 (Calendar No. 4). Decided May 25, 1993.

Mark DeJonge and Chris DeJonge were convicted by a jury in the Ottawa District Court, Richard J. Kloote, J., of violating the compulsory education law by instructing their children at home without the aid of state certified teachers. The Ottawa Circuit Court, Calvin L. Bosman, J., affirmed. The Court of Appeals, DOCTOROFF, P.J., and MAHER and MARILYN J. KELLY, JJ., affirmed in an unpublished opinion (Docket No. 106149). On rehearing, the Court of Appeals reaffirmed the convictions, finding that the certification requirement was constitutional as the least restrictive means to meet the state's interest. The Supreme Court, in lieu of granting leave to appeal, remanded the case to the Court of Appeals for reconsideration in light of *Employment Div, Dep't of Human Resources v Smith,* 494 US 872 (1990), and *Dep't of Social Services v Emmanuel Baptist Preschool,* 434 Mich 380 (1990). Following remand, the Court of Appeals affirmed, finding that because of the defendants' opposition to all state involvement in the education of their children, the alternative individual examinations would impose just as great a burden on their religious beliefs (Docket No. 134296). The defendants appeal.

In an opinion by Justice RILEY, joined by Chief Justice CAVANAGH, and Justice GRIFFIN, and a separate opinion by Justice LEVIN, the Supreme Court *held:*

The state failed to show that the teacher certification requirement is the least restrictive means of discharging its interest in the education of the defendants' children, requiring reversal of their convictions.

Justice RILEY, joined by Chief Justice CAVANAGH and Justice GRIFFIN, additionally stated that the teacher certification requirement is an unconstitutional violation of the Free Exercise Clause of the First Amendment as applied to families whose

REFERENCES

Am Jur 2d, Schools §§ 228, 231, 232.

Religious beliefs of parents as defense to prosecution for failure to comply with compulsory education law. 3 ALR2d 1401.

religious convictions prohibit the use of certified instructors. Such families should be exempt from the dictates of the teacher certification requirement.

The Free Exercise Clause of the First Amendment ensures protection from government interference in the exercise of religion. Such protection is an affirmative duty of the government, mandated by the inherent nature of religious liberty, not one of mere toleration. Religious liberty is a deeply private, fundamental, and inalienable right by which a citizen's beliefs and practices are shielded from the hostile intolerance of society.

When rights under the Free Exercise Clause are combined with the constitutionally protected right of parents to direct the education of their children, requirements such as Michigan's teacher certification requirement must undergo strict scrutiny as manifested in the compelling interest test to survive. The test considers whether a defendant's belief, or conduct motivated by belief, is sincerely held; whether it is religious in nature; whether a state regulation imposes a burden on the exercise of the belief or conduct; whether a compelling state interest justifies the burden imposed; and whether there is a less obtrusive form of regulation available.

In this case, the defendants' belief is both sincerely held and religiously based, the teacher certification requirement directly and heavily burdens the exercise of their religion and is neither essential to nor the least restrictive means of achieving the state's interest, and a less burdensome regulation could be enacted.

Reversed.

Justice MALLETT, joined by Justices BRICKLEY and BOYLE, dissenting, stated that the state has a compelling interest in the universal education of its children and the teacher certification requirement is an effective means of achieving that interest. Because accommodation of the defendants' religious beliefs would unduly interfere with the state's fulfillment of its interest, their convictions and the decision of the Court of Appeals should be affirmed.

188 Mich App 447; 470 NW2d 433 (1991) reversed.

CONSTITUTIONAL LAW — HOME SCHOOLS — FREE EXERCISE OF RELIGION — TEACHER CERTIFICATION.

The requirement that parents who provide home schooling for their children must provide instructors certified by the state is an unconstitutional violation of the Free Exercise Clause of the First Amendment as applied to families whose religious convic-

tions prohibit the use of certified instructors; such families are exempt from the requirement (US Const, Am I; MCL 388.553; MSA 15.1923).

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Ronald J. Frantz,* Prosecuting Attorney, and *Gregory J. Babbitt,* Assistant Prosecuting Attorney, for the people.

*Kallman & Cropsey* (by *David A. Kallman*) and *Christopher J. Klicka* and *Michael P. Farris* for the defendants.

Amici Curiae:

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Paul J. Zimmer,* Assistant Attorney General, for the State Board of Education.

*Mark Brewer* (*Paul Denenfeld,* of counsel), for the ACLU Fund of Michigan.

#### AFTER REMAND

RILEY, J. At issue is the constitutionality of MCL 388.553; MSA 15.1923, which requires parents who conduct home schooling for their children to provide instructors certified by the state. We hold that the teacher certification requirement is an unconstitutional violation of the Free Exercise Clause of the First Amendment as applied to families whose religious convictions prohibit the use of certified instructors. Such families, therefore, are exempt from the dictates of the teacher certification requirement.

I

Defendants Mark and Chris DeJonge taught

their two school-age children at home in accordance with their religious faith. The DeJonges utilized a program administered by the Church of Christian Liberty and Academy of Arlington Heights, Illinois.

Because the DeJonges taught their children at home without the aid of certified teachers, the Ottawa Area Intermediate School District charged them with violating the compulsory education law, as codified in the School Code, MCL 380.1561(1), (3); MSA 15.41561(1), (3). This act requires parents of children from the age of six to sixteen to send their children to public schools or to state-approved nonpublic schools.[1] To qualify as a state-approved nonpublic school, students must be in-

[1] MCL 380.1561(1); MSA 15.41561(1) mandates:

Except as provided in subsections (2) and (3), every parent, guardian, or other person in this state having control and charge of a child from the age of 6 to the child's sixteenth birthday, shall send that child to the public schools during the entire school year. The child's attendance shall be continuous and consecutive for the school year fixed by the school district in which the child is enrolled. In a school district which maintains school during the entire calendar year and in which the school year is divided into quarters, a child shall not be compelled to attend public school more than 3 quarters in 1 calendar year, but a child shall not be absent for 2 consecutive quarters.

MCL 380.1561(3); MSA 15.41561(3), however, crafts an exception to the compulsory school attendance law for state-approved nonpublic schools:

A child shall not be required to attend the public schools in the following cases:
(a) A child who is attending regularly and is being taught in a state approved nonpublic school, which teaches subjects comparable to those taught in the public schools to children of corresponding age and grade, as determined by the course of study for the public schools of the district within which the nonpublic school is located.

structed by certified teachers. MCL 388.553; MSA 15.1923.[2]

At time of trial, the prosecution never questioned the adequacy of the DeJonges' instruction or the education the children received. Michael McHugh, an employee of the Church of Christian Liberty and Academy, testified that his organization provided the DeJonges with "testing, individualized curriculum, and monitoring of the home school." Unpublished opinion of the Court of Appeals, decided August 8, 1989 (Docket No. 106149), p 2.[3]

McHugh testified further that this educational program, in use since 1968, had been employed by "many of thousands of youngsters who have attended and successfully graduated from major colleges and universities throughout the United States . . . ." Indeed, with respect to the DeJonge children, the trial judge noted that he was "very impressed with the support that they have, the credentials of the witnesses that have testified and

---

[2] A "state approved nonpublic school," as defined in the School Code, is a nonpublic school which complies with the private, denominational and parochial schools act. MCL 388.551-388.558; MSA 15.1921-15.1928. The act requires that all nonpublic school students in the State of Michigan be taught by certified teachers only:

> No person shall teach or give instruction in any of the regular or elementary grade studies in any private, denominational or parochial school within this state who does not hold a certificate such as would qualify him or her to teach in like grades of the public schools of the state . . . . [MCL 388.553; MSA 15.1923.]

[3] McHugh explained the broad range of curriculum subjects:

> [A]ll students in our Academy systems . . . have a complete course of study which [includes] an area of Bible Studies, phonics, reading and literature . . . spelling and vocabulary and penmanship . . . language or grammar studies, mathematic studies, science, history . . . music, arts and crafts and physical education. And we also do place a heavy emphasis upon character development within the studies and relate that directly to the bible studies . . . .

the reports that apparently are very, very favorable report on the education of the children."

The DeJonges testified that they began teaching their children at home in August of 1984 because they wished to provide them a "Christ centered education." The DeJonges believe that "the major purpose of education is to show a student how to face God, not just show him how to face the world."[4]

That the DeJonges' opposition to the certification requirement was religiously motivated was beyond question. At the close of the proceedings, the trial judge concluded that he had no "question about the conviction or the sincerity of the DeJonges on this position," and that the teacher certification requirement conflicted with a "very, very honest and sincere religious conviction."

Nevertheless, the DeJonges were convicted and sentenced to two years probation for instructing their children without state certified teachers. They were each fined $200, required to test their children for academic achievement, and ordered to arrange for certified instruction.

The Ottawa Circuit Court affirmed their convictions, and the DeJonges appealed in the Court of Appeals, where their case was consolidated with *People v Bennett.*[5] The Court affirmed both trial

[4] Mark DeJonge testified that Michigan's requirement that all children be taught by certified teachers violates their religious beliefs because the family "believe[s] that scripture is the complete and inherit [sic] word of God. That it specifically teaches that parents are the ones that are responsible to God for the education of their children. And for us to allow the State to insert [sic] God's authority, for us to submit to that would be a sin." McHugh also testified that many of the courses required by the state "are based upon a false and pagan religion known as secularism or secular humanism."

[5] The defendants in both the instant case and in *People v Bennett (After Remand),* 442 Mich 316; 501 NW2d 106 (1993), maintained that the certification requirement infringed their Fourteenth Amendment right to direct the education of their children. We do not reach this issue in the instant case, but address the question in *Bennett, supra.*

court decisions, and reaffirmed their convictions on rehearing. 179 Mich App 225; 449 NW2d 899 (1989) *(DeJonge II)*.

In so ruling, the Court recognized that with respect to the DeJonges the "burden of the state certification law on the belief is high, and there appears to be no room for compromise," *DeJonge II, supra* at 235. Nevertheless, the Court ruled that the certification requirement was constitutional as the least restrictive means to meet the state's interest.[6]

On October 17, 1990, this Court, in lieu of granting leave to appeal, remanded the case to the Court of Appeals for reconsideration in light of recent case precedent.[7] 436 Mich 875 (1990).

Following remand, the Court of Appeals again

---

[6] The DeJonges contend that adequate alternative means to the certification requirement exist that would meet the state's need to monitor the academic achievement of the children, while allowing the DeJonges to comply with their religious faith. The DeJonges specifically propose that their children be monitored by individualized standardized achievement testing, and note that such testing is the core requirement utilized in most other states. Indeed, the DeJonges note that the other forty-nine states in the Union use a variety of alternative means, including testing, standard core curricula, and minimum class hours or days, which serve those states' needs while protecting the religious freedom of its citizens.

The Court of Appeals disagreed:

> [T]he state has a .compelling interest which justifies the burden on the DeJonges' religious freedom imposed by teacher certification. Michigan has had an intense concern about the quality of the education of its citizens . . . . The teacher certification requirement is a backbone in the protection of this vital state interest. [*DeJonge II, supra* at 236.]

[7] *Employment Div, Dep't of Human Resources v Smith,* 494 US 872; 110 S Ct 1595; 108 L Ed 2d 876 (1990), and *Dep't of Social Services v Emmanuel Baptist Preschool,* 434 Mich 380; 455 NW2d 1 (1990).

In *Smith,* the Court created a new standard of review for most cases involving the Free Exercise of Religion Clause.

In *Emmanuel Baptist Preschool,* the Court held that the state may not enforce the accreditation aspects of the program director qualifications rule regarding preschools and day care centers, since to do so would violate the free exercise of religious beliefs.

affirmed the defendants' convictions. 188 Mich App 447; 470 NW2d 433 (1991) *(DeJonge III)*. The Court reiterated its prior findings, and added that "since Mr. DeJonge opposes all state involvement in the education of his children, this alternative [individual examinations] would impose just as great a burden on his religious beliefs. Accordingly, we reaffirm the DeJonges' convictions." *Id.* at 452.

On appeal before this Court, the DeJonges contend that the certification requirement violates their First Amendment right of free exercise of religion, and submit that the Court of Appeals misapplied the compelling interest test by not requiring the state to establish that the certification requirement is essential to and the least restrictive means of achieving a compelling state interest.

II

At issue then is whether Michigan's teacher certification requirement for home schools violates the Free Exercise Clause of the First Amendment of the United States Constitution as applied to the State of Michigan by the Fourteenth Amendment of the United States Constitution.[8] The Free Exercise Clause proclaims: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."[9]

[8] Section 1 of the Fourteenth Amendment of the United States Constitution applies the First Amendment to the individual states. *Everson v Bd of Ed,* 330 US 1, 15; 67 S Ct 504; 91 L Ed 711 (1947).

[9] The Michigan Constitution is at least as protective of religious liberty as the United States Constitution. Article 1, § 4 of the Michigan Constitution declares:

Every person shall be at liberty to worship God according to the dictates of his own conscience. No person shall be compelled to attend, or, against his consent, to contribute to the erection or support of any place of religious worship, or to pay

Thus, we begin our analysis by considering the historical underpinnings of the First Amendment. This Court has long held that the constitution must be interpreted in light of the original intent and understanding of its drafters.[10] The framers' intent must be understood in conjunction with the intentions and understanding of the constitution held by its ratifiers:

> The intent of the framers, however, must be used as part of the primary rule of "common understanding" described by Justice COOLEY:
> " 'A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.' "[11]

A necessary corollary of these principles is that the constitution can only properly be understood by studying its common meaning as well as " 'the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished . . . .' "[12]

These rules of constitutional construction are indispensable because "[t]he literal construction of the words, without regard to their obvious purpose

tithes, taxes or other rates for the support of any minister of the gospel or teacher of religion. No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary; nor shall property belonging to the state be appropriated for any such purpose. The civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief.

[10] *Committee for Constitutional Reform v Secretary of State*, 425 Mich 336, 342; 389 NW2d 430 (1986).

[11] *Id.* at 342, quoting *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971), quoting Cooley, Const Lim (6th ed), p 81.

[12] *Id.* at 340. See also *Kearney v Bd of State Auditors*, 189 Mich 666, 673; 155 NW 510 (1915).

of protection, is to make the constitutional safe-
guard no more than a shabby hoax, a barrier of
words, easily destroyed by other words. . . . A
constitutional limitation must be construed to ef-
fectuate, not to abolish, the protection sought by it
to be afforded." *Lockwood v Comm'r of Revenue*,
357 Mich 517, 556-557; 98 NW2d 753 (1959).[13]
Hence, a thorough examination of the historical
origins of the Free Exercise Clause is essential to
the proper disposition of the case at issue, and
more important, to the preservation of religious
freedom.[14]

This American experiment[15] includes an unprec-
edented protection of religious liberty from tyran-
nical government action. Springing forth from this
nation's founding principle that government is
"instituted for [the] protection of the rights of
mankind,"[16] the Free Exercise of Religion Clause
ensured protection from government interference
as the first freedom in the Bill of Rights.[17]

The prominence of religious liberty's protection

[13] Contrary to the assertions of the dissent, such constitutional
construction does not impose "doctrine" in lieu of "legal analysis."
Indeed, adherence to original intent is crucial to ensure that courts do
not "substitute their own pleasure to the constitutional intentions of "
the people. Hamilton, *The Federalist Papers*, No 78, Kramnick, ed
(England: Penguin Books, 1987 [originally published in 1788]), p 440.

[14] "To determine the meaning of the religion clauses, it is necessary
to see them through the eyes of their proponents . . . ." McConnell,
*The origins and historical understanding of free exercise of religion*,
103 Harv L R 1409, 1437 (1990). Indeed, "[n]o provision of the Consti-
tution is more closely tied to or given content by its generating
history than the religious clause of the First Amendment." *Everson*, n
8 *supra* at 33 (Rutledge, J., dissenting).

[15] Referred to by the Founding Fathers as *novus ordo seclorum*, a
new order for the ages.

[16] Gouverneur Morris, quoted in 2 Records of the Federal Conven-
tion of 1787 (Farrand rev ed, 1966), p 222.

[17] The Founding Fathers proclaimed that "extending to its citizens
all the blessings of civil & religious liberty" is the "great end" and
the "object of our government . . . ." Charles Pickney, quoted in 4
Records of the Federal Convention of 1787 (Farrand rev ed, 1966), pp
28-29.

in the Bill of Rights is no historical anomaly, but the consequence of America's vigorous clashes regarding religious freedom. The First Amendment's protection of religious liberty was born from the fires of persecution, forged by the minds of the Founding Fathers, and tempered in the struggle for freedom in America.[18]

As our history forcefully attests, the Founding Fathers envisioned the protection of the free exercise of religion as an affirmative duty of the government mandated by the inherent nature of religious liberty, not one of mere "toleration" by government.[19] Most significant in this history was

[18] For an exhaustive examination of prerevolutionary religious persecution, as well as the development of religious freedom in the colonies, see McConnell, n 14 *supra* at 1421-1430.

[19] Jefferson explained that religious liberty is a fundamental freedom outside the legitimate sphere of government power unless threatening to harm another. Jefferson, Notes on the State of Virginia, quoted in Padover, *The Complete Jefferson* (New York: Duell, Sloan & Pearce, Inc, 1943), p 675. Madison echoed Jefferson by agreeing that religious liberty is immune "from civil jurisdiction, in every case where it does not trespass on private rights or the public peace." Madison, letter to Edward Livingston (July 10, 1822), quoted in Alley, ed, *James Madison on Religious Liberty* (New York: Prometheus Books, 1985), p 82.

Indeed, this understanding of religious freedom was dominant in the state governments that ratified the Bill of Rights:

> The Free Exercise Clause was patterned after the various free exercise and freedom of conscience provisions in then-existing state constitutions. At the time of the ratification of the Bill of Rights, twelve of the thirteen states had such provisions. Of those twelve, nine either explicitly or implicitly expressed the following belief: The free exercise of religion is protected unless it endangers the public's peace and safety. . . . This formulation was a precursor to the compelling-interest test and implies that the free exercise of religion was understood to include an exemption from generally applicable laws. [McConnell, *Should Congress pass legislation restoring the broader interpretation of free exercise of religion?*, 15 Harv J of L & Pub Pol 181, 185-186 (1992).]

> Article LVI of Georgia's 1777 Constitution is typical: "All persons whatever shall have the free exercise of their religion; provided it be not repugnant to the peace and safety of the State." [*Id.* at 186, n 18.]

the dramatic confrontation regarding the proposed renewal of Virginia's tax levy for the support of the established church.[20] This embroilment bore James Madison's Memorial and Remonstrance Against Religious Assessments,[21] delivered in the Virginia House of Burgess in opposition to the levy, as well as Thomas Jefferson's Virginia Bill of Religious Liberty, enacted in the levy's stead.[22] Madison's Memorial and Remonstrance Against Religious Assessments explained as "a fundamental and undeniable truth"[23] that religious liberty is a deeply private, fundamental, and inalienable right by which a citizen's religious beliefs and practices are shielded from the hostile intolerance of society,[24] while Jefferson's Virginia Bill for Reli-

---

For a survey of all thirteen constitutions, see McConnell, n 14 supra at 1456-1458.

[20] For an extensive discussion of the Virginia struggle for religious liberty, see Everson, n 8 supra at 34-39 (Rutledge, J., dissenting).

[21] See Everson, n 8 supra, appendix at 63-73.

[22] Madison's Memorial and Remonstrance Against Religious Assessments and Jefferson's Bill for Religious Liberty are well recognized in constitutional law as invaluable interpretative tools essential to achieving the necessary insight to understand the protections afforded by the Free Exercise Clause of the First Amendment. See, e.g., Committee for Public Ed & Religious Liberty v Nyquist, 413 US 756, 760; 93 S Ct 2955; 37 L Ed 2d 948 (1973); Abington Twp School Dist v Schempp, 374 US 203, 214; 83 S Ct 1560; 10 L Ed 2d 844 (1963); Everson, n 8 supra at 13. Madison, of course, was the principal draftsman of the Religion Clauses of the First Amendment, as well as the floor leader in the House of Representatives in support of the Bill of Rights, and "[t]here is little doubt that the sentiments expressed in the final wording [of the Free Exercise Clause] conformed to Madison's basic principles." Alley, n 19 supra at 213.

[23] Madison, Memorial and Remonstrance Against Religious Assessments, quoted in Everson, n 8 supra, appendix at 64.

[24] Thomas Jefferson expressed a similar understanding of the nature of religious liberty:

The magistrate has no power but what the people gave. The people have not given him the care of souls because they could not, . . . because no man has *right* to abandon the care of his salvation to another. No man has *power* to let another prescribe his faith. [Jefferson, Notes on Religion, October 1776?, quoted in *The Complete Jefferson*, n 19 supra at 944. Emphasis in original.]

gious Liberty protected the right of the free exercise of religion, as well as barred state established churches. The Founders understood that this zealous protection of religious liberty was essential to the "preservation of a free government."[25]

The Founding Fathers then reserved special protection for religious liberty as a fundamental freedom in the First Amendment of the constitution. This fortification of the right to the free exercise of religion was heralded as one of the Bill of Rights' most important achievements. Indeed, Jefferson proclaimed that "[n]o provision in our constitution ought to be dearer to man than that which protects the rights of conscience against the enterprises of the civil authority."[26]

These views were representative of the Founding Fathers. See Howe, *The Garden and the Wilderness: Religion and Government in American Constitutional History* (Chicago & London: University of Chicago Press, 1965), pp 17-18.

[25] Madison, Memorial and Remonstrance Against Religious Assessments, quoted in *Everson*, n 8 *supra*, appendix at 65.

[26] Jefferson, Reply to Address to the Society of the Methodist Episcopal Church at New London, Connecticut, February 4, 1809, quoted in *The Complete Jefferson*, n 19 *supra* at 544. See also *Lee v Weisman*, 505 US —, —; 112 S Ct 2649, 2656; 120 L Ed 2d 467 (1992) ("[t]he First Amendment's Religion Clauses mean that religious belief and religious expression are too precious to be either proscribed or prescribed by the State"); *Sherbert v Verner*, 374 US 398, 413; 83 S Ct 1790; 10 L Ed 2d 965 (1963) (Stewart, J., concurring) ("no liberty is more essential to the continued vitality of the free society which our Constitution guarantees than is the religious liberty protected by the Free Exercise Clause explicit in the First Amendment and imbedded in the Fourteenth"); *Everson*, n 8 *supra* at 34 (Rutledge, J., dissenting) ("[f]or Madison, as also for Jefferson, religious freedom was the crux of the struggle for freedom in general"); Howe, n 24 *supra* at 160, 164-165 ("the framers assumed that the realm of religious interests and religious convictions occupied a special constitutional status;" it is a "historically undeniable fact that religious interests seemed to the framers to deserve special safeguarding"); Tribe, American Constitutional Law (2d ed), § 14-7, p 1189 ("[t]he Framers . . . clearly envisioned religion as something special; they enacted that vision into law by guaranteeing the free exercise of *religion* but not, say, of philosophy or science"). Hence, this Court has "no loftier duty or responsibility than to uphold that spiritual freedom to its farthest reaches." *West Virginia Bd of Ed v Barnette*, 319 US 624, 645; 63 S Ct 1178; 87 L Ed 1628 (1943) (Murphy, J., concurring).

III

In *Employment Div, Dep't of Human Resources v Smith,* 494 US 872, 881; 110 S Ct 1595; 108 L Ed 2d 876 (1990), the Court ruled that the "Free Exercise Clause in conjunction with other constitutional protections, such as . . . the right of parents, acknowledged in *Pierce* [*v Society of Sisters,* 268 US 510; 45 S Ct 571; 69 L Ed 1070 (1925)], to direct the education of their children, see *Wisconsin v Yoder,* 406 US 205 [92 S Ct 1526; 32 L Ed 2d 15] (1972)," demands the application of strict scrutiny.[27] Hence, Michigan's teacher certification re-

---

[27] We are not unaware of the criticism generated in reaction to *Smith,* which held that the First Amendment does not bar the "application of a neutral, generally applicable law to religiously motivated" conduct unless the Free Exercise Clause is in "conjunction with other constitutional protections . . . ." *Smith, supra* at 881. See, e.g., Smith, *The rise and fall of religious freedom in constitutional discourse,* 140 U Penn L R 149, 231, 232, 233 (1991) (referring to *Smith, supra,* as "the virtual abandonment of the Free Exercise Clause," "reach[ing] a low point in modern constitutional protection under the Free Exercise Clause," "leav[ing] the Free Exercise Clause without independent constitutional content and thus, for practical purposes, largely meaningless"); McConnell, *Religious freedom at a crossroads,* 59 U Chicago L R 115, 140 (1992) ("*Smith* converts a constitutionally explicit liberty into a nondiscrimination requirement, in violation of the most straightforward interpretation of the First Amendment text"); Laycock, *Summary and synthesis: The crisis in religious liberty,* 60 Geo Wash L R 841 (1992) (summarizing a symposium of ten articles and finding that "[n]o one in this symposium takes seriously the possibility that *Employment Div v Smith* might be defensible"). Nevertheless, this Court must follow the interpretation of the Free Exercise Clause in the prevailing opinions of the United States Supreme Court, "even though we may be in accord with the dissenting opinions in those cases." *People v Lechner,* 307 Mich 358, 360-361; 11 NW2d 918 (1943).

On the other hand, we may certainly interpret the Michigan Constitution as affording additional protection to the free exercise of religion. However, because the ruling of *Smith, supra* at 881, commands that strict scrutiny be applied in the case at issue, we do not undertake to determine at this time the extent of the Michigan Constitution's protection of the free exercise of religion generally. We do hold, however, that the Michigan Constitution mandates that strict scrutiny as articulated in this opinion be applied in the instant case. *Alexander v Bartlett,* 14 Mich App 177, 181; 165 NW2d 445 (1968)

quirement must undergo strict scrutiny to survive a free exercise challenge.[28]

This strict scrutiny is manifested in the "compelling interest" test, which is composed of five elements:

(1) whether a defendant's belief, or conduct motivated by belief, is sincerely held;

(2) whether a defendant's belief, or conduct motivated by belief, is religious in nature;

(3) whether a state regulation imposes a burden on the exercise of such belief or conduct;

(4) whether a compelling state interest justifies the burden imposed upon a defendant's belief or conduct;

(5) whether there is a less obtrusive form of regulation available to the state. *Yoder, supra* at 214-230; *Dep't of Social Services v Emmanuel Baptist Preschool,* 434 Mich 380, 391-396; 455 NW2d 1 (1990) (CAVANAGH, J., concurring), 430 (GRIFFIN, J., concurring).[29]

## A

The first element of the compelling interest test

(art 1, § 4 of the Michigan Constitution " 'guarantees to every person the liberty to worship God according to the dictates of his own conscience' ").

[28] Although "[t]he Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such," *McDaniel v Paty,* 435 US 618, 626; 98 S Ct 1322; 55 L Ed 2d 593 (1978), the case at issue involves more than government interference with mere belief; hence, the balancing approach of the compelling interest test must be utilized.

[29] In *Emmanuel Baptist Preschool, supra,* Justice CAVANAGH, writing separately, joined Justice GRIFFIN's concurring opinion, "to form a majority on the issue of the Free Exercise Clause standard of review" in accordance with Justice RILEY's opinion in *Sheridan Rd Baptist Church v Dep't of Ed,* 426 Mich 462, 574-578; 396 NW2d 373 (1986), cert den 481 US 1050 (1987). *Emmanuel Baptist Preschool, supra* at 390 (CAVANAGH, J., concurring).

is met by the DeJonges because their belief is
sincerely held. "[W]hile the 'truth' of a belief is
not open to question, there remains the significant
question whether it is 'truly held.' This is the
threshold question of sincerity which must be
resolved in every case. It is, of course, a question
of fact . . . ." *United States v Seeger,* 380 US 163,
185; 85 S Ct 850; 13 L Ed 2d 733 (1965). As noted,
after extensive trial testimony, the trial judge
concluded that "[t]he Court does not have any
question about the conviction or the sincerity of
the DeJonges on this position." Furthermore, the
state does not contest the sincerity of the De-
Jonges' beliefs.

**B**

Similarly, because the DeJonges' belief is reli-
giously based, the second element of the compel-
ling interest test is met. To be afforded the protec-
tion of the Free Exercise Clause, an individual's
behavior must be religiously motivated, as the
Court in *Yoder, supra* at 215-216, explained:

A way of life, however virtuous and admirable,
may not be interposed as a barrier to reasonable
state regulation of education if it is based on
purely secular considerations; to have the protec-
tion of the Religion Clauses, the claims must be
rooted in religious belief. . . . Thus, if the Amish
asserted their claims because of their subjective
evaluation and rejection of the contemporary secu-
lar values accepted by the majority, much as
Thoreau rejected the social values of his time and
isolated himself at Walden Pond, their claims
would not rest on a religious basis. Thoreau's
choice was philosophical and personal rather than

religious, and such belief does not rise to the demands of the Religion Clauses.[30]

Thus, this Court must determine whether a religious belief is sincerely held, not whether such beliefs are true or reasonable. *United States v Ballard*, 322 US 78, 86; 64 S Ct 882; 88 L Ed 1148 (1944). This Court must accept a worshiper's good-faith characterization that its activity is grounded in religious belief because "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v Comm'r of Internal Revenue*, 490 US 680, 699; 109 S Ct 2136; 104 L Ed 2d 766 (1989).[31] This must be so because "[m]en may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others." *Ballard, supra* at 86.

Nor is religious orthodoxy necessary to obtain the protection of the Free Exercise Clause. Religious belief and conduct need not be endorsed or mandated by a religious organization to be protected. *Emmanuel Baptist Preschool, supra* at 392 (CAVANAGH, J., concurring). Indeed, because popular religious beliefs are rarely threatened by elected legislators, the Free Exercise Clause's major benefactors are religious minorities or dissidents whose beliefs and worship are suppressed or shunned by the majority. To hold otherwise would be to deny that "Religion . . . must be left to the conviction and conscience of every man . . . ."[32]

[30] See also *Emmanuel Baptist Preschool, supra* at 391-392 (CAVANAGH, J., concurring).

[31] See also *Smith, supra* at 887; *Emmanuel Baptist Preschool, supra* at 392 (CAVANAGH, J., concurring).

[32] Madison, Memorial and Remonstrance Against Religious Assess-

The DeJonges testified that they taught their children at home without complying with the certification requirement because they wished to provide for their children a "Christ-centered education." Because the DeJonges' faith professes "that parents are the ones that are responsible to God for the education of their children," they passionately believe that utilizing a state-certified teacher is sinful. Their faith, although unusual, may not be challenged or ignored.[33]

C

The third element of the test is also met because the certification requirement clearly imposes a burden on the exercise of the DeJonges' religious freedom. A burden may be shown if the "affected individuals [would] be coerced by the Government's action into violating their religious beliefs [or whether] governmental action [would] penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng v Northwest Indian Cemetery Protective Ass'n*, 485 US 439, 449; 108 S Ct 1319; 99 L Ed 2d 534 (1988). Hence, "[a] claimed burden on religious beliefs may be deemed constitutionally *insignificant*, but only (1) if the claimant's beliefs do not create an irreconcilable conflict between the mandates of law and religious duty, or (2) if the legal requirement does not directly coerce the claimant to act contrary to religious belief . . . ." *Emmanuel Baptist Preschool, supra* at 393 (CAVANAGH, J., concurring). Put simply, the petitioner must prove that he has been "enforced,

ments, quoting Virginia Declaration of Rights, Article 16, quoted in *Everson*, n 8 *supra*, appendix at 64.

[33] We note again that the state does not contest the religious motivation of the DeJonges' beliefs.

restrained, molested, or burdened . . . [or] otherwise suffer[ed], on account of his religious opinions or beliefs . . . ."[34] The burden on religious liberty, however, need not be overwhelming, because "[e]ven subtle pressure diminishes the right of each individual to choose voluntarily what to believe." *Lee v Weisman,* 505 US —; 112 S Ct 2649, 2665; 120 L Ed 2d 467 (1992) (Blackmun, J., concurring).[35]

In the instant case, the findings of the trial court, to which this Court grants due deference, amply reveal that the teacher certification requirement directly and heavily burdens the DeJonges' exercise of their religion. As noted, the DeJonges believe that the word of God commands them to educate their children without state certification. Any regulation interfering with that commandment is state regulation of religion.[36] The certification requirement imposes upon the DeJonges a loathsome dilemma: they must either violate the law of God to abide by the law of man, or commit a crime under the law of man to remain faithful to God. The requirement presents an "irreconcilable conflict between the mandates of law and religious duty . . . ." *Emmanuel Baptist Preschool, supra* at 393 (CAVANAGH, J., concurring).

---

[34] A Bill for Establishing Religious Freedom, quoted in *The Complete Jefferson,* n 19 *supra* at 947.

[35] Indeed, as one of the few comments regarding the original drafts of the Free Exercise Clause in our First Congress reveal, the threshold to find a sufficient burden is very slight as "rights of conscience . . . will little bear the gentlest touch of governmental hand . . . ." Representative Daniel Carroll, quoted in 1 Annals of Congress 730 (August 15, 1789) (Joseph Gales ed, Washington, Gales & Seaton, 1834).

[36] *United States v Lee,* 455 US 252, 257; 102 S Ct 1051; 71 L Ed 2d 127 (1982), quoting *Thomas v Review Bd of Indiana Employment Security Div,* 450 US 707, 716; 101 S Ct 1425; 67 L Ed 2d 624 (1981) (facially accepting "the appellee's contention that both payment and receipt of social security benefits is forbidden by the Amish faith" because the " '[c]ourts are not arbiters of scriptural interpretation' ").

Moreover, this is not a case in which the De-Jonges must forgo a government benefit or privilege in lieu of their religious beliefs,[37] because the state compels through criminal sanction both mandatory education and the certification requirement. In *Yoder,* the Court found that compulsory education for Amish children past the eighth grade violated the Free Exercise Clause because the criminal sanctions imposed compelled the Amish to violate their religious faith: "The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Id.* at 218. Similarly, the state's enforcement of the teacher certification requirement compels the De-Jonges to sin, as they have been coerced by the state to educate their children in direct violation of their religious faith. In other words, as applied to the DeJonges, the certification requirement "inescapably compels conduct that [plaintiffs] find objectionable for religious reasons." *Bowen v Roy,* 476 US 693, 706; 106 S Ct 2147; 90 L Ed 2d 735 (1986).[38] Indeed, perhaps the most striking state

---

[37] Of course, such government action may violate the free exercise of religion:

"Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." [*Hobbie v Unemployment Appeals Comm of Florida,* 480 US 136, 141; 107 S Ct 1046; 94 L Ed 2d 190 (1987), quoting *Thomas,* n 36 *supra* at 717-718.]

[38] See also *Emmanuel Baptist Preschool, supra* at 434-435 (GRIFFIN, J., concurring).

burden upon religious liberty imaginable, criminal prosecution, was imposed upon the DeJonges for following their interpretation of the word of God.[39]

### D

Finally, the certification requirement is unconstitutional because it fails to meet the remaining two prongs of the compelling interest test, which presume that a state's burden of the free exercise of religion is invalid unless the burden is essential to the fulfillment of a compelling state interest.[40] Hence, strict scrutiny demands that (1) a state regulation be justified by a compelling state interest, and (2) the means chosen be essential to further that interest.[41]

Furthermore, a compelling state interest must be truly compelling, threatening the safety or welfare of the state in a clear and present manner.[42]

---

[39] The dissent's characterization of the DeJonges' interests as "secular" education is simply a fundamental misunderstanding of their religious beliefs and practices. As the United States Supreme Court recognized in *Yoder,* educational practices motivated by religion clearly fall within the protection of Free Exercise Clause. *Yoder, supra* at 218.

[40] *Lee,* n 36 *supra* at 257-258 ("[t]he state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest"); *Yoder, supra* at 233-234.

[41] As application of strict scrutiny reveals, the dissent's contention that this Court has found "a fundamental right to direct the education of their children completely free of state regulation" is clearly erroneous. *Post* at 301. We simply find that the state has failed to meet the rigorous requirements of strict scrutiny.

[42] Contrary to the assertions of the dissent, the free exercise of religion is protected by the same safeguards as other fundamental rights. Madison explained in his Memorial and Remonstrance:

[F]inally, "the equal right of every citizen to the free exercise of his Religion according to the dictates of conscience" is held by the same tenure with all our other rights. If we recur to its origin, it is equally the gift of nature; if we weigh its importance, it cannot be less dear to us; if we consult the [Virginia

Declaration of Rights], . . . it is enumerated with equal solemnity, or rather studied emphasis. Either then, we must say, that the will of the Legislature is the only measure of their authority; and that in the plenitude of this authority, they may sweep away all our fundamental rights; or, that they are bound to leave this particular right untouched and sacred: Either we must say, that they may controul [sic] the freedom of the press, may abolish the trial by jury, may swallow up the Executive and Judiciary Powers of the State; nay that they may despoil us of our very right of suffrage, and erect themselves into an independent and hereditary assembly: or we must say, that they have no authority to enact into law the Bill under consideration. [Madison Memorial and Remonstrance, quoting Virginia Declaration of Rights, quoted in *Everson,* n 8 *supra,* appendix at 71.]

Jefferson concurred when he declared in the Kentucky Resolutions (adopted by the Kentucky Legislature on November 10, 1798, in protest of the infamous Alien and Sedition Acts) that the First Amendment "guarding in the same sentence, and under the same words, the freedom of religion, of speech, and of the press: insomuch, that whatever violated either, throws down the sanctuary which covers the others, and that libels, falsehood, and defamation, equally with heresy and false religion, are withheld from the cognizance of federal tribunals." Jefferson, The Kentucky Resolutions, quoted in *The Complete Jefferson,* n 19 *supra* at 130. See also n 18.

Hence, the United States Supreme Court has noted:

In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. . . . The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a "rational basis" for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect. [*Barnette,* n 26 *supra* at 639.]

See also *Sherbert,* n 26 *supra* at 403 (collecting cases and concluding that the only religiously motivated conduct that has been constitutionally regulated has "invariably posed some substantial threat to public safety, peace or order"); *Prince v Massachusetts,* 321 US 158, 167; 64 S Ct 438; 88 L Ed 645 (1944) ("when state action impinges upon a claimed religious freedom, it must fall unless shown to be necessary for or conducive to the child's protection against some clear and present danger"). Accordingly, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Yoder, supra* at 215.

The state asserts that it has a compelling state interest in ensuring the adequate education of all children. Indeed, "[t]here is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education. Providing public schools ranks at the very apex of the function of a State." *Yoder, supra* at 213 (citations omitted). The importance of compulsory education has been recognized because "some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence. Further, education prepares individuals to be self-reliant and self-sufficient participants in society." *Id.* at 221. Our commitment to education is deeply rooted in our history: "[t]he American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted." *Meyer v Nebraska,* 262 US 390, 400; 43 S Ct 625; 67 L Ed 1042 (1923).

Michigan has an equally deeply rooted commitment to education. Article 8, § 1 of our constitution, paralleling the language of the Northwest Ordinance of 1787, proclaims the vital nature of education in Michigan:

> Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.[43]

---

[43] Former Governor James Blanchard illustrated the importance education has historically played in the lives of Michigan's citizens:

"For decades, the promise of education has been the ladder of opportunity in this state. Hard-working people, honest people, lived here or came here, knowing that they themselves could earn a decent living working with their hands—but even more

Nevertheless, our rights are meaningless if they do not permit an individual to challenge and be free from those abridgments of liberty that are otherwise vital to society:

> [F]reedom of worship . . . is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order. [*West Virginia Bd of Ed v Barnette*, 319 US 624, 638, 642; 63 S Ct 1178; 87 L Ed 2d 1628 (1943).]

Hence, Michigan's interest in compulsory education is not absolute and must yield to the constitutional liberties protected by the First Amendment. The United States Supreme Court explained:

> Thus, a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of

---

important, that their children could find an even better future working with their minds because of Michigan's fine schools and colleges and universities." [Governor Blanchard, State of the State Address 1984, quoted in *Sheridan Rd Baptist Church*, n 29 *supra* at 479-480 (WILLIAMS, J.).]

Even in times of fiscal crisis, current Governor John Engler stated that the education of Michigan's children must be our foremost duty, priority, and hope:

> Our prescription for Michigan's fiscal crisis does include one absolute spending priority. For as we build our future, we must focus on one precious resource: our children. My budget will fulfill another pledge to our citizens: to put *education* back at the top of the agenda, where it belongs. [Governor Engler, State of the State Address, 1991 Journal of the House 185.]

*Pierce* [*supra* at 535], "prepare [them] for additional obligations." [*Yoder, supra* at 214.]

Although the state asserts that "its interest in its system of compulsory education is so compelling that" the DeJonges' religious practices must give way, "[w]here fundamental claims of religious freedom are at stake, . . . we cannot accept such a sweeping claim . . . we must searchingly examine the interests that the State seeks to promote . . . and the impediment of those objectives that would flow from recognizing the claimed [religious] exemption." *Yoder, supra* at 221.

Indeed, such a searching examination in the instant case is enlightening because it reveals that the state has focused upon the incorrect governmental interest. The state's interest is not ensuring that the goals of compulsory education are met, because the state does not contest that the DeJonges are succeeding at fulfilling such aims. Rather, the state's interest is simply the certification requirement of the private school act, not the general objectives of compulsory education. The interest the state pursues is the manner of education, not its goals.[44]

Hence, the state's narrow interest in maintaining the certification requirement must be weighed against the DeJonges' fundamental right of the free exercise of religion. Because exemptions are the remedy provided in cases in which a general law abridges religious liberty,[45] this Court must

---

[44] *Care and Protection of Charles,* 399 Mass 324, 336; 504 NE2d 592 (1987) ("we agree with the parents that the State interest . . . lies in ensuring that the children . . . receive an education, not that the educational process be dictated in its minutest detail").

[45] The State may "accommodate" the free exercise of religion by relieving people from generally applicable rules that interfere with their religious callings. [*Weisman, supra,* 112 S Ct 2676 (Souter, J., concurring).]

focus on the effect granting such religious exemptions would have on the purported state interest.[46] If this Court does not find a substantial effect on the asserted interest, an exemption is warranted because no compelling interest is affected. *Yoder, supra* at 237; *Sherbert, supra* at 407.[47] In the case at issue, if the state fails to prove that exemptions from the teacher certification requirement impair the state's asserted interest, then no balancing is necessary. The state, therefore, must establish that enforcing the certification requirement, without exception, is essential to ensure the education required by the compulsory education law. *United States v Lee,* 455 US 252, 257-258; 102 S Ct 1051; 71 L Ed 2d 127 (1982). If less intrusive means fulfill the government's purported interest, then an exemption must be granted and the alternative implemented.[48]

Moreover, accommodation of religious worship and beliefs is often necessary to fulfill the obligations of the Free Exercise Clause:

> Most religions encourage devotional practices that are at once crucial to the lives of believers and idiosyncratic in the eyes of nonadherents. By definition, secular rules of general application are drawn from the nonadherent's vantage and, consequently, fail to take such practices into account. Yet when enforcement of such rules cuts across religious sensibilities, as it often does, it puts those affected to the choice of taking sides between God and government. In such circumstances, accommodating religion reveals nothing beyond a recognition that general rules can unnecessarily offend the religious conscience when they offend the conscience of secular society not at all. [*Weisman, supra,* 112 S Ct 2677 (Souter, J., concurring).]

See also *Hobbie,* n 37 *supra* at 146; *Yoder, supra* at 234; *Sherbert, supra* at 410.

[46] *Emmanuel Baptist Preschool, supra* at 436 (GRIFFIN, J., concurring) ("[t]o override claims of religious exemption, the state must demonstrate a compelling need to apply the law in the particular case at bar").

[47] See also *Emmanuel Baptist Preschool, supra* at 395 (CAVANAGH, J., concurring) ("[n]o balancing of interest is required if accommodation of that burden would not unduly impair or materially detract from the furtherance of compelling state interests").

[48] This Court has rejected alternative interpretations of the stan-

Nevertheless, the state in the instant case has failed to provide evidence or testimony that supports the argument that the certification requirement is essential to the preservation of its asserted interest. Conversely, while the record is barren of evidence supporting the state's claim, it clearly indicates that the DeJonge children are receiving more than an adequate education: they are fulfilling the academic and socialization goals of compulsory education without certified teachers or the state's interference. Nor has the state suggested that the DeJonges have jeopardized the health or safety of their children, or have a potential for significant social burdens. In sum, the state has failed to provide one scintilla of evidence that the DeJonge children have suffered for the want of certified teachers; it has failed to prove a "clear and present" or "grave and immediate" danger to the welfare of the children that justifies the onerous burden placed upon the DeJonges' exercise of their religious beliefs.

Furthermore, the experience of our sister states provides irrefutable evidence that the certification requirement is not an interest worthy of being deemed "compelling." The nearly universal con-

dard of review, as expressed in the dissenting opinion in *Sheridan Rd Baptist Church,* n 29 *supra,* and *Emmanuel Baptist Preschool.* In *Emmanuel Baptist Preschool, supra* at 398, Justice CAVANAGH noted:

The dissent applies a version of strict scrutiny—the "substantial state interest test"—that is not consistent with established law . . . . This standard departs from established precedent in at least two respects. First, it improperly places the burden of proof on the free exercise claimant in establishing the existence of less restrictive alternatives. Second, it does *not* place the burden on the state of showing that there are no less restrictive alternatives that can accommodate the claimant's burden. *Yoder* remains good law, and must be applied here in the manner as described in *Sheridan Rd, supra* at 574-578 (RILEY, J.).

See also *Emmanuel Baptist Preschool, supra* at 430 (GRIFFIN, J., concurring).

sensus of our sister states is to permit home schooling without demanding teacher certified instruction.[49] Indeed, many states have recently rejected the archaic notion that certified instruction is necessary for home schools. Within the last decade, over twenty states have repealed teacher certification requirements for home schools. Devins, Fundamentalist Christian Educators v State: *An inevitable compromise,* 60 Geo Wash L R 818, 819 (1992).[50]

The relevance of the practice of our sister states becomes clear when empirical studies disprove a positive correlation between teacher certification and quality education. A study by Dr. Brian Ray of the National Home Education Research Institute found that "there was no [statistically significant] difference in students' total reading, total math, or total language scores based on the teacher certifi-

[49] Besides Michigan, only two states, California and Alabama, appear to mandate teacher certification in home schools. Cal Ed Code 48224; Ala Code 16-28-1. Alabama, however, exempts "church schools" from the teacher certification requirement, Ala Code 16-28-1, and the DeJonges' program most likely would be such a school. Although Kansas bars the usual home school, *In re Sawyer,* 234 Kan 436; 672 P2d 1093 (1983), it permits private, denominational, and parochial instruction by "competent" instructors. Kan Stat Ann 72-1111.

[50] Further, contrary to the assertions of the state, many of our sister states have much less stringent supervisory control over home schooling than does Michigan. In North Carolina, for example, recent legislative reforms have limited state regulation of home schools to two requirements: home instructors must have a high school diploma or equivalent, and home school students must take an annual achievement test. NC Gen Stat 115C-564. Similarly, Nebraska permits "parents who find existing state regulations in conflict with their religious beliefs [to] satisfy state compulsory-education laws by submitting an 'informational statement' that declares that their children attend school for 175 days a year and that they are instructed in core curriculum subjects." Devins, Fundamentalist Christian Educators v State, *supra* at 831, citing Neb Rev Stat 79-1701. Louisiana, Minnesota, and Colorado utilize standardized achievement tests to monitor home schools. La Rev Stat Ann 17:236.1(D); Minn Stat Ann 120.101; Colo Rev Stat 22-33-104.5. Perhaps most interesting, Mississippi has appeared to have abdicated any regulation over home and private schools. Miss Code 37-13-91(10).

cation status (i.e., neither parent had been certi-
fied, one had been, or both had been) of their
parents." National Home Education Research In-
stitute, *A Nationwide Study of Home Education:
Family Characteristics, Legal Matters, and Stu-
dent Achievement* (Salem, Oregon: National Home
Education Research Institute, 1990), p 12.[51] The
compelling nature of the teacher certification re-
quirement is not extant.

E

In any event, even if the state possessed a
compelling state interest, it has failed to prove
that the certification requirement is essential to
that interest.[52] The Court of Appeals asserted that
"[t]he teacher certification requirement is a back-
bone in the protection of" state education, and
that the DeJonges did not "propose[ ] an alterna-
tive" to teacher certification. *DeJonge II, supra* at
236; *DeJonge III, supra.* But, the record fails to
support this assertion. In *Sherbert, supra* at 407,
the Court held that because the plaintiff had "no
proof whatever to warrant" fears that its compel-
ling interest would be endangered by alternative
means, the state had failed to meet its burden.
Similarly, in the instant case, the state's sweeping
assertion must be turned aside when it is not

[51] In parallel fashion, Dr. Judith Lanier, the state's education
expert in *Sheridan Rd Baptist Church,* n 29 *supra* at 563-564 (RILEY,
J.), testified that "she was unaware of any empirical evidence estab-
lishing any correlation between compliance with the administrative
certification rules and teacher competence or student learning." *Id.* at
563, n 64. Similarly, Dr. Donald A. Erickson testified in the same case
that "with respect to the existence of extensive empirical evidence
that no such relationship [between certification and student perfor-
mance] has been found." *Id.* at 561, n 57.

[52] As noted in n 6, the DeJonges propose that individualized stan-
dardized achievement testing is an adequate device that the state
may utilize to monitor the education of their children. The state's
attempt to discredit the viability of that option is unpersuasive.

supported by evidence.[53] The state's contention is particularly suspect when no other state has such "a backbone." To find that of all the states in the Union only Michigan meets the aims of compulsory education is untenable and flies in the face of the aforementioned studies.[54]

Moreover, in *Yoder, supra* at 222-223, the Supreme Court held that the success of Amish teaching methods proved that the state's compulsory

[53] The dissent unequivocally concludes that "[t]he certification requirement is an effective means, chosen by the state to achieve its interest in the education of school-age children. In fact, the certification requirement ensures that educators possess a minimal level of competency before they may take on the task of preparing our children for their future endeavors." *Post* at 307. The record does not support this contention. In fact, the state did not present any evidence that supports this assertion, but merely relied on the lead opinion in this Court's equally divided and unprecedential decision in *Sheridan Rd* to posit that teacher certification met the compelling interest test. The state's sole witness, James Bergers, Assistant Superintendent for the Ottawa Intermediate School District, testified only that defendants violated the law at issue. The state, then, failed to meet its burden of proof. See *Emmanuel Baptist, supra* at 417, n 58 (CAVANAGH, J., concurring) ("Mere speculation by the government as to the probable or possible injury to the state from granting a Free Exercise Clause exemption, is not enough to justify infringing upon the free exercise of religion").

Similarly, the dissent's claim that the characterization of the state's interest may not be closely scrutinized and that adherence to the Free Exercise Clause is "to radically alter the relationship between the Legislature and the Court" stems from the dissent's misunderstanding of the strong protections afforded religious liberty by the First Amendment. *Post* at 308. See ns 17, 39.

[54] Our purpose in citing the practices of our sister states in the controversy at issue is not to suggest that Michigan must follow less stringent academic standards, or to suggest that Michigan must follow the trends of other states. Our purpose is simply to determine whether the teacher certification requirement is essential to the achievement of a compelling state interest. In no manner do we mean to defile a central tenet of our federal constitutional system, that each state may proceed on a different course and implement programs diverse from its sisters in matters not delegated to the national government, as long as they do not infringe upon the rights of its citizens. To hold otherwise would stifle Michigan, often "a single courageous State" and leader in social, economic, and political reform, from experimenting in diverse and unique policy. *New State Ice Co v Liebmann,* 285 US 262, 311; 52 S Ct 371; 76 L Ed 747 (1932) (Brandeis, J., dissenting).

education system did "little to serve" the state's interest. The Court ruled that because "[t]his case, of course, is not one in which any harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred," the state's argument that its power as *parens patriae* permitted it to extend secondary education to children regardless of the religious wishes of their parents, must fail. *Yoder, supra* at 230. Similarly, in the instant case, the success of the Church of Christian Liberty and Academy and the DeJonges repudiates the state's argument that the certification requirement is essential to the goals of compulsory education.[55]

Indeed, the State of Michigan itself now permits noncertified teachers possessing a bachelor's degree to teach in nonpublic schools;[56] nor is the certification requirement enforced with regard to substitute teachers in public schools.[57] Even Michigan, then, does not command a certification requirement for the great majority of its students, but only for those taught by their parents at home.[58]

---

[55] Cf. *Murphy v Arkansas,* 852 F2d 1039, 1042-1043 (CA 8, 1988) (finding that a state requirement that home schooling must be accompanied by standardized achievement testing as the least restrictive means, thereby implicitly recognizing that teacher certification is not the least restrictive means); *Care and Protection of Charles,* n 44 *supra* at 339 ("certification would not appropriately be required for parents under a home school proposal. . . . Nor must the parents have college or advanced academic degrees").

[56] The Michigan Department of Education permits nonpublic schools in Michigan to utilize uncertified teachers who possess a bachelor's degree as stipulated in *Sheridan Rd Baptist Church v Dep't of Ed,* unpublished opinion of the Ingham Circuit Court, decided May 3, 1988 (Docket No. 80-26205-AZ).

[57] *Detroit Schools Short 151 Teachers,* The Detroit News, December 12, 1989 (public school administrators admitted that most of the open teaching positions were filled with noncertified teachers).

[58] We acknowledge that in *Fellowship Baptist Church v Benton,* 815 F2d 485, 493 (CA 8, 1987), the court ruled that a certification require-

The state, however, argues that the proposed alternative means are more intrusive upon the religious beliefs of the DeJonges than the current certification requirement. We, however, do not presume to make that judgment. We believe that the DeJonges are the best judges of which regulations are the most burdensome or least intrusive upon their religion. To entertain the notion that either this Court or the state has the insight to interpret the DeJonges' religion more correctly than they is simply "an arrogant pretension."[59]

ment was "the best means available today to satisfy its interest in the education of its children does not violate plaintiffs' right to the free exercise of their religion." *Fellowship Baptist Church, supra* at 494. We also note that the certification requirement at issue in *Fellowship Baptist Church* is no longer in place.

Moreover, we are not persuaded by the *Fellowship Baptist Church* analysis, given the practices of nearly all states and the reality that certification may be adequately replaced by alternative methods of instruction. (Standardized testing and access to educational materials, for instance, are proven adequate alternatives. *Care and Protection of Charles,* n 44 *supra* at 340.) Which alternative Michigan utilizes, if any, is a matter of legislative discretion, but Michigan may not impose a certification requirement that substantially burdens the free exercise of religion when less burdensome alternative means are available.

Furthermore, even if some adverse effects occur because of alternative means, the importance of religious liberty outweighs such problems:

> In *Yoder,* the Court implicitly conceded that the Amish children who failed to attend high school would not receive the same level of intellectual learning and, thus, that the state's objective would not be as fully realized if an exemption were given. The Court went further, however, and held that the resulting adverse effect upon the achievement of the state's interest did not *unduly* interfere with the fulfillment of that interest. Thus, the Court implicitly held that it was not quite sufficient for the state to show that an exemption would impair its ability to fully achieve its goals; an exemption was required even at some slight sacrifice to the state's objectives. *Yoder,* thus, stands for the proposition that the state's interest must be read broadly and flexibly in determining whether that interest could still be fulfilled if an exemption were granted. [*Sheridan Rd Baptist Church,* n 29 *supra* at 575 (RILEY, J.).]

[59] Madison, Memorial and Remonstrance Against Religious Assess-

Similarly, the Court of Appeals assertion that because Mark DeJonge's beliefs would bar all state interference, the certification requirement is therefore constitutional is incredulous. First, the assertion that the DeJonges' beliefs prohibit any and all types of state monitoring or guidance is erroneous; the DeJonges have administered standardized tests and emphasized at oral argument that they do not object to such testing.[60] More important, the constitution forbids the state to impose any regulation that burdens religion and is not essential to the fulfillment of a compelling state interest. Because teacher certification does not meet that constitutional burden, the DeJonges must be exempt from it regardless of their other religious views if a less burdensome regulation may be enacted. To hold otherwise would be to sanction the most intrusive and egregious infringement of religious beliefs because another intrusion, although much less burdensome, also burdens a religious belief.

Furthermore, the Court of Appeals erroneously placed the burden of proof upon the DeJonges. The Court of Appeals, by requiring that the individual burdened by governmental regulation prove that alternatives exist, while at the same time accepting at face value unsubstantiated assertions by the state, has turned constitutional jurisprudence on its head. Our citizens need not "propose an alternative" to be afforded their constitutional liberties. *Lee, supra* at 257-258; *Yoder, supra* at 233-234. We are persuaded that the burden of proof correctly placed in the instant case is fatal to the state's certification requirement.

### IV

In sum we conclude that the historical under-

ments, quoted in *Everson,* n 8 *supra,* appendix at 67. See also *Thomas,* n 36 *supra* at 714.

[60] See ns 6 and 51.

pinnings of the First Amendment of the United States Constitution and the case law in support of it compels the conclusion that the imposition of the certification requirement upon the DeJonges violates the Free Exercise Clause. We so conclude because we find that the certification requirement is not essential to nor is it the least restrictive means of achieving the state's claimed interest. Thus, we reaffirm "that sphere of inviolable conscience and belief which is the mark of a free people." *Weisman,* 112 S Ct 2658. We hold that the teacher certification requirement is an unconstitutional violation of the Free Exercise Clause of the First Amendment as applied to families whose religious convictions prohibit the use of certified instructors. Such families, therefore, are exempt from the dictates of the teacher certification requirement.

Accordingly, we reverse the DeJonge convictions.

CAVANAGH, C.J., and GRIFFIN, J., concurred with RILEY, J.

LEVIN, J. (*concurring*). I join in the reversal of the convictions because I agree with the majority that the state failed to discharge its burden of showing that the teacher certification requirement is the least intrusive means of discharging its interest in the education of the DeJonge children.

MALLETT, J. We respectfully dissent from the majority opinion. The decision of the Court of Appeals should be affirmed.

I

The present case requires this Court to examine the Free Exercise Clause and the cases that have

interpreted it.[1] In *Employment Div, Dep't of Human Resources v Smith,* 494 US 872, 881; 110 S Ct 1595; 108 L Ed 2d 876 (1990), the Court held that the Free Exercise Clause does not relieve a person from complying with valid or neutral laws of general applicability simply because the law is contrary to the claimant's religious practice. However, the Court noted:

> The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as . . . the right of parents, acknowledged in *Pierce v Society of Sisters,* 268 US 510 [45 S Ct 571; 69 L Ed 1070 (1925)] to direct the education of their children, see *Wisconsin v Yoder,* 406 US 205 [92 S Ct 1526; 32 L Ed 2d 15 (1972)].[2]

Thus, in the absence of a "hybrid situation"[3] in which a claimant alleges a violation of the Free Exercise Clause *and* another, recognized constitutional protection, an exemption from compliance with the law will not be granted as long as the law is otherwise valid and generally applicable to all segments of society. As a result of *Smith,* constitutional challenges on the basis of the Free Exercise Clause alone are defeated, because successful constitutional challenges turn on the existence of another recognized constitutional right. The major-

[1] The majority's assertion that this Court has long held that the constitution must be interpreted in light of the intent and understanding of its drafters seems to inject needlessly, and therefore gratuitously, the original intent debate into the present controversy. Given the lack of authority for the majority's position, resort to the "Founding Fathers" suggests the substitution of doctrine for legal analysis.

[2] *Smith,* 494 US 881.

[3] *Id.* at 882.

ity's conclusion that the teacher certification requirement violates the Free Exercise Clause and the DeJonges' right to direct the education of their children is a significant expansion of Michigan law with which we disagree. In *Pierce* and *Yoder, supra,* the Court recognized parents' rights to direct the religious education of their children. Today, the majority holds that parents have a fundamental constitutional right, when coupled with the Free Exercise Clause, to direct the secular education of their children, as well. The majority's conclusion, while not defensible under a *Smith* analysis, does not withstand careful examination even if one accepts the existence of a hybrid situation.

The claimants rely on *Pierce, supra,* and *Meyer v Nebraska,* 262 US 390; 43 S Ct 625; 67 L Ed 1042 (1923), as support for a fundamental right to direct the education of their children completely free of state regulation. However, *Pierce* and *Meyer* addressed the elimination of parental choice, while the present case deals with the regulation of it. In *Murphy v Arkansas,* 852 F2d 1039, 1043 (CA 8, 1988), the court concluded that "recognition of such a right would fly directly in the face of those cases in which the Supreme Court has recognized the broad power of the state to compel school attendance and regulate curriculum and teacher certification."[4]

---

[4] The court in *Murphy* relied on *Bd of Ed v Allen,* 392 US 236, 245-247; 88 S Ct 1923; 20 L Ed 2d 1060 (1968), which stated:

> Since *Pierce,* a substantial body of case law has confirmed the power of the States to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction. Indeed, the State's interest in assuring that these standards are being met has been considered a sufficient reason for refusing to accept instruction at home as

It is true that at trial, the DeJonges' minister testified that his church teaches that children are given by God to parents, and that Scripture clearly teaches that the responsibility of educating children belongs to the parents. Michael McHugh, from the Church of Christian Liberty and Academy, testified that the curriculum prescribed by his organization to the DeJonge children included a heavy emphasis on character development through Bible study, which also permeates into the traditional subject-matter areas. It is true that Mark DeJonge testified that in contravention of their faith, the certification requirement makes the DeJonges responsible to the state, and not God, for their children's education. This testimony, the majority argues, sufficiently establishes that the teacher certification requirement implicates directly the DeJonges' right to direct the secular education of their children.

Pursuant to this finding, an examination of the DeJonges' free exercise claim requires this Court to balance the respective interests of the parties. In *Sherbert v Verner,* 374 US 398, 403; 83 S Ct 1790; 10 L Ed 2d 965 (1963), the Court stated that in order for a state regulation that infringes on free exercise rights to remain valid, the regulation must be justified by a compelling state interest. The appropriate free exercise inquiry is whether government has placed a substantial burden on the observation of a religious belief or practice

compliance with compulsory education statutes. These cases were a sensible corollary of *Pierce v Society of Sisters* [*supra*]: if the State must satisfy its interest in secular education through the instrument of private schools, it has a proper interest in the manner in which those schools perform their secular educational function.

See also *State v Faith Baptist Church,* 207 Neb 802; 301 NW2d 571 (1981).

and, if so, whether a compelling governmental interest justifies the burden. *Hernandez v Comm'r of Internal Revenue,* 490 US 680; 109 S Ct 2136; 104 L Ed 2d 766 (1989); *Hobbie v Unemployment Appeals Comm of Florida,* 480 US 136; 107 S Ct 1046; 94 L Ed 2d 190 (1987); *Thomas v Review Bd,* 450 US 707; 101 S Ct 1425; 67 L Ed 2d 624 (1981); *Yoder* and *Sherbert, supra; Dep't of Social Services v Emmanuel Baptist Preschool,* 434 Mich 380; 455 NW2d 1 (1990); *Sheridan Rd Baptist Church v Dep't of Ed,* 426 Mich 462; 396 NW2d 373 (1986), cert den 481 US 1050 (1987). Under the "compelling interest test," the court is required to conduct a four-part inquiry.[5] First, the defendants must prove that they possess a sincerely held religious belief. *Yoder,* 406 US 215; *Emmanuel Baptist,* 434 Mich 392. Second, the defendants must prove that the state regulation imposes a burden on the free exercise of their belief. *Tony & Susan Alamo Foundation v Secretary of Labor,* 471 US 290, 303; 105 S Ct 1953; 85 L Ed 2d 278 (1985); *United States v Lee,* 455 US 252, 256-257; 102 S Ct 1051; 71 L Ed 2d 127 (1982); *Emmanuel Baptist,* 434 Mich 393.

Once the defendants successfully establish the first two parts of the test, the court will inquire whether the state possesses a compelling interest that justifies the burden imposed upon the defendants' beliefs. *Hobbie,* 480 US 141-142; *Emmanuel Baptist,* 434 Mich 395. Once a compelling interest is clearly established, the majority would require the state to prove that the teacher certification requirement is the least restrictive means of regu-

[5] We have combined the first two steps of the compelling interest test as articulated by the majority. The claimant's burden pursuant to the compelling interest test, as articulated by this dissent, is consistent with the approach taken in *Sheridan Rd* and *Emmanuel Baptist, supra.*

lation.[6] We disagree. In *United States v Lee, supra,*
the Court departed from the "least restrictive
means" requirement. After concluding that the
government's interest in assuring mandatory and
continuous participation in the social security sys-
tem is "very high,"[7] the Court stated that the
"remaining inquiry is whether accommodating the
Amish belief will *unduly interfere* with fulfillment
of the governmental interest."[8] Although the Court
declined to further define "undue interference,"
surely it is a less burdensome standard than the
"least restrictive means" requirement.[9] Thus, in
the present case, this Court should inquire
whether accommodation of the DeJonges' beliefs
would unduly interfere with the fulfillment of the
state's interest in education.

The majority would apparently further require
the regulation to be the least restrictive when
compared with the other forty-nine states. Un-
doubtedly, we can survey similar regulations uti-
lized in our sister states in order to determine the
relative obtrusiveness of our requirements. Yet,
the mere existence of less restrictive regulation in
other states tells us little about that state's success
at achieving the compelling interest in universal
education. Indeed, some states may have quality

---

[6] "Least restrictive means" is a requirement that evades an exact-
ing definition. In *Illinois State Bd of Elections v Socialist Workers
Party,* 440 US 173, 188-189; 99 S Ct 983; 59 L Ed 2d 230 (1979),
Justice Blackmun, concurring, warned that we should exercise cau-
tion in the application of this elusive principle.

> "[L]east drastic means" is a slippery slope . . . [, and a] judge
> would be unimaginative indeed if he could not come up with
> something a little less "drastic" or a little less "restrictive" in
> almost any situation, and thereby enable himself to vote to
> strike legislation down.

[7] *Id.* at 259.

[8] *Id.* (emphasis added).

[9] See Tribe, American Constitutional Law (2d ed), § 14-13, p 1261.

objectives that differ from those of Michigan. Re-
gardless, we do not believe it is necessary for the
state to establish that the certification require-
ment is the least restrictive means of achieving its
compelling interest in education.

The majority would also require the state prove
that "the means chosen be essential to further
th[e] interest."[10] We disagree. In equal protection
cases involving race discrimination, the regulation
in question is presumed invalid and the court
employs strict scrutiny, in which the court asks if
the state has a compelling interest and if the
means chosen are essential to further that inter-
est.[11] However, for purposes of the Free Exercise
Clause, this equal protection inquiry is not a part
of the compelling interest test adopted by this
Court. Unlike the equal protection inquiry, there
is no presumption of invalidity and the claimant
bears the initial burden. By imposing such a sub-
stantial burden on the state, the majority's com-
pelling interest test is specifically designed to
cause the state to fail.

II

A

Applying the compelling interest test to the
present case, we reach several conclusions differ-
ent from those of the majority. We agree with the
majority that the DeJonges possess a sincerely

---

[10] *Ante* at 286, citing *United States v Lee,* 455 US 257-258.

[11] See *Palmore v Sidoti,* 466 US 429, 432-433; 104 S Ct 1879; 80 L
Ed 2d 421 (1984). "[Racial] classifications are subject to the most
exacting scrutiny; to pass constitutional muster, they must be justified
by a compelling governmental interest and they must be 'necessary
. . . to the accomplishment' of their legitimate purpose . . . ." See
also *McLaughlin v Florida,* 379 US 184, 196; 85 S Ct 283; 13 L Ed 2d
222 (1964); *Loving v Virginia,* 388 US 1, 11; 87 S Ct 1817; 18 L Ed 2d
1010 (1967).

held religious belief.[12] There is sufficient evidence on the record for the trial judge to conclude that the DeJonges' convictions and sincerity were beyond dispute. In order to meet the second part of the inquiry, the DeJonges must prove that the state regulation imposes a burden on the exercise of their belief. A burden may be found where a state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs . . . ." *Thomas,* 450 US 718. Stated in another manner, "[t]he question is whether the 'affected individuals [would] be coerced by the Government's action into violating their religious beliefs [or whether] governmental action [would] penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens.' " *Emmanuel Baptist,* 434 Mich 393, quoting *Lyng v Northwest Indian Cemetery Protective Ass'n,* 485 US 439, 449; 108 S Ct 1319; 99 L Ed 2d 534 (1988).

B

Because the DeJonges met their burden regarding the first two parts of the compelling interest test, the reviewing court must be satisfied that the state possesses a compelling interest that justifies the burden imposed upon the DeJonges' religious beliefs. In *Prince v Massachusetts,* 321 US 158, 166; 64 S Ct 438; 88 L Ed 645 (1944), the Court indicated the relative importance of the state's interest in the welfare of children.

> [T]he family itself is not beyond regulation in the public interest, as against a claim of religious liberty. *Reynolds v United States,* 98 US 145 [25 L Ed 244 (1878)]; *Davis v Beason,* 133 US 333 [33 L

____
[12] *Ante* at 281-283.

Ed 637 (1890)]. And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways.

The majority concludes that "the state's interest is simply the certification requirement of the private school act, not the general objectives of compulsory education. The interest the state pursues is the manner of education, not its goals."[13] We disagree.

We believe that the state possesses a compelling interest in education. The majority properly notes the importance of education to the vitality of our state and nation, and it is unnecessary to reiterate those sentiments.[14] The statements expressed by the majority lead an objective reader to conclude that the state's interest in this case is the universal education of school-age children, and not the certification requirement. The certification requirement is an effective means, chosen by the state to achieve its interest in the education of school-age children. In fact, the certification requirement ensures that educators possess a minimal level of competency before they may take on the task of preparing our children for their future endeavors. As Justice BOYLE noted in *Sheridan Rd,* 426 Mich 509-510:

> The teacher certification requirements are essentially prophylactic in nature. Certification does not guarantee that a person will be an effective teacher, but it increases the probability that a teacher will be competent. Therefore, the certifica-

[13] *Ante* at 290.
[14] *Ante* at 288, n 43.

tion requirements help prevent children from be-
ing exposed to unqualified teachers. [Boyle, J.,
concurring.]

Furthermore, although correctly observing that
the Court may not recharacterize the defendants'
beliefs, the majority offers no support for what is
actually the crux of its argument—that is, that
this Court has the authority to recharacterize the
nature of the state's interest as the "manner of
education."[15] Nor, of course, is there any support
in decisions from the United States Supreme Court
for the even more remarkable proposition that the
state's interest is not in "ensuring that the goals
of compulsory education are met, because the state
does not contest that the DeJonges are succeeding
at fulfilling such aims."[16] To conclude that the
state is without authority to protect all of the
children within its boundaries unless it can prove
that a given parent is not satisfying the state's
interest is to radically alter the relationship be-
tween the Legislature and the Court. Such a re-
sult, it might be noted, would assuredly offend the
Founding Fathers.

The majority would require the state to prove
that its compelling interest is "truly compelling,
threatening the safety or welfare of the state in a
clear or present manner."[17] However, such a re-
quirement is untenable. *West Virginia Bd of Ed v
Barnette*, 319 US 624; 63 S Ct 1178; 87 L Ed 1628
(1943), is not authority for holding that the Free
Exercise Clause requires the state to prove that

---

[15] *Ante* at 290.

[16] *Ante* at 290.

[17] *Ante* at 286. If, in fact, this inquiry was a part of the compelling
interest test, *the conduct or actions being regulated* would threaten
the safety or welfare of the state.

the parent's right threatens the state in a clear
and present manner.[18] In *Sherbert v Verner,* 374
US 403, the Court utilized the "clear and present
manner" language in an effort to categorize its
prior decisions in which it rejected free exercise
challenges to government regulation. "The conduct
or actions so regulated have invariably posed some
substantial threat to public safety, peace or or-
der."[19] Simply because the Court in *Sherbert* used
this language to categorize those decisions in
which state regulation was upheld, it does not
necessarily follow that in all cases thereafter a
threat to the safety or welfare of the state is
required in order for a free exercise challenge to
be rejected. Most importantly, this Court has not
expressly adopted a "clear and present manner"
requirement in association with the compelling
interest test, and such an expansion is unwar-
ranted here.

---

[18] The language excerpted by the majority and relied upon for this
conclusion is dicta. *Barnette* is arguably a free speech case that
marginally implicates the Free Exercise Clause. At issue in *Barnette*
was the constitutionality of a resolution requiring students to salute
the flag and recite the Pledge of Allegiance. The Court stated:

> It is now a commonplace that censorship or suppression of
> expression of opinion is tolerated by our Constitution only
> when the expression presents a clear and present danger of
> action of a kind the State is empowered to prevent and punish.
> . . . To sustain the compulsory flag salute we are required to
> say that a Bill of Rights which guards the individual's right to
> speak his own mind, left it open to public authorities to compel
> him to utter what is not in his mind. [*Id.* at 633-634.]

The "clear and present danger" test is an historic and important
part of free speech jurisprudence. See *Schenck v United States,* 249
US 47; 39 S Ct 247; 63 L Ed 470 (1919); *Abrams v United States,* 250
US 616; 40 S Ct 17; 63 L Ed 1173 (1919); *Gitlow v New York,* 268 US
652; 45 S Ct 625; 69 L Ed 1138 (1925); *Dennis v United States,* 341 US
494; 71 S Ct 857; 95 L Ed 1137 (1951). The "clear and present danger"
inquiry represents an approach to free speech issues that is inapplica-
ble to our present Free Exercise Clause inquiry.

[19] *Id.*

C

Finally, this Court must inquire whether accommodating the DeJonges' religious beliefs would unduly interfere with fulfillment of the state's interest in education. The private, denominational, and parochial schools act[20] provides a basic pronouncement regarding teachers' qualifications. Pursuant to the act, a teacher must hold a "certificate such as would qualify him or her to teach in like grades of the public schools of the state . . . ."[21] The express intent of the act is to institute qualifications for teachers that employ the same standard as that provided by the general school laws of the state.[22] Thus, in order to ascertain the minimum qualifications for certification in nonpublic schools, it is essential to examine the requirements for certification in the public schools.

The Legislature charged the State Board of Education with the duty of determining the requirements and issuing all licenses and certificates for teachers.[23] The majority asserts that Michigan "does not command a certification requirement for the great majority of its students, but only for those taught by their parents at home."[24] We disagree.

The Legislature has issued a directive to the various local school boards of the state. Because this directive implicates the qualifications for teachers in the public schools, it is applicable to the qualifications for teachers in nonpublic schools. See MCL 388.553; MSA 15.1923. The Legislature

[20] MCL 388.551-388.555, 388.557-388.558; MSA 15.1921-15.1925, 15.1927-15.1928.

[21] MCL 388.553; MSA 15.1923.

[22] MCL 388.551; MSA 15.1921.

[23] See MCL 380.1531; MSA 15.41531.

[24] *Ante* at 296.

has expressly stated that local school boards shall not permit instruction by a teacher who does not possess a valid teaching certificate.[25] If, in fact, such an individual is teaching within the district, the state board must be immediately notified.[26] However, the certification requirement is not "absolute." Subject to the availability of a certified teacher,[27] a local school board may engage a noncertified instructor to teach computer science, a foreign language, mathematics, biology, chemistry, engineering, physics, or robotics to students in grades nine through twelve.[28] The noncertified teacher must possess a bachelor's degree, major in or possess a graduate degree in the field of specialization to be taught, and have two years of occupational experience in the field to be taught. If the instructor intends to teach for more than one year, then the instructor must pass a basic skills examination and a subject area examination. Thus, the certification requirement has not been abandoned for the majority of teachers, and the Legislature has added an element of flexibility to the requirement in order to attract qualified individuals to teach high school students specialized fields of study.

The State Board of Education also established a set of exceptions within which a person may be qualified to teach without a valid teacher's certificate. Under the State Board of Education's

[25] MCL 380.1233; MSA 15.41233.

[26] MCL 380.1233(3); MSA 15.41233(3), provides an exception for vocational instructors. Through June 30, 1995, the local school board may renew an annual vocational authorization of a noncertified vocational instructor, provided that the instructor is enrolled and completing credit in an approved vocational teacher preparation program, and that the instructor has a program on file with the employing school district, the educational institution, and the Department of Education.

[27] See MCL 380.1233b; MSA 15.41233(2).

[28] *Id.*

Teacher Certification Code,[29] in addition to possessing a teaching certificate,[30] a person with "vocational authorization"[31] or a "special permit"[32] is authorized to teach in the public schools.

The state board issues three types of special permits: full-year special permits,[33] substitute permits,[34] and emergency permits. Emergency permits are issued as follows:

[29] 1989 AACS, R 390.1101 *et seq.*

[30] "Michigan teaching certificate" means any of the following:
  (i)   A permanent certificate.
  (ii)  A life certificate.
  (iii) A provisional certificate.
  (iv)  An occupational education certificate.
  (v)   A continuing certificate.
  (vi)  A professional education certificate.
  (vii) A temporary or full vocational authorization. [1989 AACS, R 390.1101(f).]

[31] "Vocational authorization" is actually included within the definition of "Michigan teaching certificate." 1989 AACS, R 390.1101(f)(vii). However, because the Teacher Certification Code provides separate guidelines for its application and issuance, I have chosen to note its existence independently of the teacher certificate. See 1989 AACS, R 390.1162; 1987 AACS, R 390.1165.

[32] 1989 AACS, R 390.1141 to 390.1143; R 390.1145 to 390.1146.

[33]  (1) A full-year special permit shall be issued when a properly certificated teacher is unavailable for a regular teaching assignment.
  (2) An application for a full-year special permit shall contain evidence that the candidate has completed 120 semester hours of satisfactory college credit, as defined in R 390.1141 including 15 semester hours of appropriate professional education credit.
  (3) A full-year special permit is valid for teaching in the grades or subjects or grade and subjects specified on the permit until June 30 of the school year for which the permit is issued.
  (4) A full-year special permit will be renewed when evidence is presented that a person has completed 6 semester hours of satisfactory additional credit applying on requirements for regular certification and that a properly certified teacher is unavailable for a regular teaching assignment. [1989 AACS, R 390.1142.]

[34]  (1) An application for a substitute permit shall contain evidence that the candidate has completed not less than 120

In emergency situations and on recommendation of the superintendent of a local or intermediate school district, the state board may issue a permit for a candidate with reasonable qualifications if a candidate who meets the requirements for obtaining a substitute permit or a full-year permit is not available and if failure to authorize this emergency permit will deprive children of an education. The permit shall be issued for a specific period of time under emergency circumstances. A labor dispute is not an emergency circumstance. [1989 AACS, R 390.1145.]

Amicus curiae State Board of Education submits that since January of 1987, it has adopted a uniform policy regarding emergency permits. Pursuant to this policy, candidates for a permit have "reasonable qualifications" if they possess a bachelor's degree. Thus, upon a finding by the local school board that another instructor is "unavailable" and that failure to authorize the permit will result in the deprivation of education, any person who has earned a bachelor's degree may obtain an emergency permit to teach.

Clearly, an element of flexibility and accommodation already exists within this statutory and administrative framework for teacher certification. Certification is required of teachers in the majority

semester hours of satisfactory credit in an approved teacher preparation program, which shall include a minimum of 6 semester hours of professional education credit. Persons who are currently enrolled in an approved teacher preparation program will be considered to have met the 6-semester-hour requirement.

(2) A substitute permit is valid for teaching on a substitute basis for a maximum of 150 days during any school year. Teaching on a substitute basis means teaching when the regular certificated teacher is temporarily absent. Such permit is not valid for any regular or extended teaching assignment.

(3) A substitute permit is renewable each year. [1989 AACS, R 390.1143.]

of circumstances. However, pursuant to statutory authority and the Teacher Certification Code, several exceptions exist in which uncertified persons may nonetheless be qualified as instructors. The requirements under these exceptions, while not particularly stringent, operate as the minimum qualifications a person must possess in order to teach. Any attempt to further reduce these minimum qualifications, or to allow parents without them nonetheless to teach their children, will increase the possibility that students will not be properly taught and thus not properly learn as much as they should, thereby causing the state to fail to achieve its compelling interest to educate.

Similarly, any alternative to the certification requirement, such as standardized testing, would fail to adequately ensure that the state's interest is being pursued vigorously. In *Sheridan Rd,* 426 Mich 484, Chief Justice WILLIAMS concluded that standardized testing is not an acceptable alternative to teacher certification.

> [Standardized testing] is an inadequate substitute because deficiencies in teaching would be discovered only after the damage has occurred. *State v Shaver,* 294 NW2d 883 (ND, 1980). Further, we are not persuaded that testing would guarantee less intrusion by the state into the functioning of the private schools.

Although the majority of our sister states have statutory authority permitting home schools, Michigan is not alone in requiring teacher certification. Alabama exempts a child from compulsory attendance if the child receives "instruct[ion] by a competent private tutor for the entire length of the school term in every scholastic year . . . ."[35]

[35] Ala Code 16-28-3.

However, a competent private tutor is a person who is certified.[36] California also grants an exemption from compulsory attendance where the child is engaged in a structured tutoring program.[37] Once again, the tutor must possess valid state certification. Finally, Kansas only exempts a child from compulsory attendance where the child attends a "private, denominational or parochial school."[38] In *State v Lowry,* 191 Kan 701; 383 P2d 962 (1963), the Kansas Supreme Court held that a home school is not the equivalent of a private, denominational, or parochial school. The court also held that home instruction does not meet the requirements of the compulsory school attendance laws. *In re Sawyer,* 234 Kan 436; 672 P2d 1093 (1983); *State v Garber,* 197 Kan 567; 419 P2d 896 (1966), app dis 389 US 51 (1967).

III

We have examined the claims of the DeJonges and the state pursuant to the compelling interest test. After careful review and balancing of the respective interests, we have determined that the state possesses a compelling interest in the universal education of its children and that the certification requirement is an effective means of achieving this interest. Further, accommodation of the DeJonges' religious beliefs would unduly interfere with the state's fulfillment of its interest in education. Accordingly, the DeJonges' convictions and the Court of Appeals decision should be affirmed.

BRICKLEY and BOYLE, JJ., concurred with MALLETT, J.

[36] Ala Code 16-28-5.
[37] See Cal Ed Code 48224.
[38] Kan Stat Ann 72-1111(a)(2).